**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**KPMG LLP, Joseph T. Boyle, Michael A. Conway, Anthony P. Dolanski, Ronald A. Safran, and Thomas J. Yoho, Defendants.**

No. 03 Civ. 671(DLC).

United States District Court, S.D. New York.

Jan. 13, 2006.

---

352

James A. Kidney, Suzanne J. Romajas, Richard Simpson, David M. Stuart, Stefan A. Hagerup, Securities and Exchange Commission, Washington, D.C., Robert B. Blackburn, Securities and Exchange Commission, New York, New York, for the Securities and Exchange Commission.

Gary F. Bendinger, Rebecca S. Parr, Bendinger, Crockett, Peterson, Greenwood & Casey, PC, Salt Lake City, Utah, for Michael A. Conway.

Scott B. Schreiber, Andrew T. Karron, Leslie Wharton, Arnold & Porter LLP, Washington, D.C., New York, New York, for Anthony P. Dolanski.

Martin L. Perschetz, Marc E. Elovitz, Yocheved Cohen, Dana M. Roth, Schulte Roth & Zabel LLP, New York, New York, for Ronald A. Safran.

Frank H. Wohl, Charles T. Spada, Joseph A. Patrice, Jennifer R. Ridha, Lankler Siffert & Wohl LLP, New York, New York, for Thomas J. Yoho.

## OPINION & ORDER

COTE, District Judge.

In this action, the Securities and Exchange Commission ("SEC") alleges that KPMG LLP ("KPMG") and several KPMG audit partners participated in a massive accounting fraud at Xerox Corporation ("Xerox") from 1997 through 2000. This Opinion concerns the summary judgment motions filed by Michael A. Conway ("Conway"), Anthony P. Dolanski ("Dolanski"), Ronald A. Safran ("Safran"), and Thomas J. Yoho ("Yoho"), the remaining defendants in the action. For the reasons stated below, the motions are granted in part.

### I. Background

A. History of the Litigation

On January 29, 2003, the SEC filed a complaint against KPMG, Xerox's auditor during the years in question, and four KPMG partners, Joseph T. Boyle ("Boyle"), Conway, Dolanski, and Safran. The complaint alleges that these defendants permitted Xerox to manipulate its accounting practices in order to fill a $3 billion gap between its actual operating results and the results it reported to the investing public. In 2001, Xerox released a $312 million restatement of 1998 and 1999 pretax earnings (the "First Restatement"). In 2002, after the scope of the alleged fraud was exposed, and with the assistance of a new auditor, Xerox issued a $6.1 billion restatement of its equipment revenues and a $1.9 billion restatement of its pre-tax earnings for the years 1997 through 2000 (the "Second Restatement").

The Second Restatement was the largest financial restatement in American history up to that time. The nature of the alleged fraud and the involvement of the various defendants are discussed in detail below, as drawn principally from the evidence presented by the SEC in opposition to these motions.

On April 9, 2003, the defendants' motion to transfer venue to the District of Connecticut, where privately filed civil actions were pending, was denied. *SEC v. KPMG LLP, et al.*, No. 03 Civ. 671(DLC), 2003 WL 1842871, at *5 (S.D.N.Y. Apr.9, 2003). In an August 20, 2003 Opinion, the SEC's motion to strike four defendants' affirmative defenses of laches, undue delay, estoppel, waiver, unclean hands, and statutes of limitations was granted. *SEC v. KPMG LLP et al.*, No. 03 Civ. 671(DLC), 2003 WL 21976733, at *4 (S.D.N.Y. Aug.20, 2003). An August 22, 2003 Opinion denied Boyle's motion to dismiss. *SEC v. KPMG LLP et al.*, No. 03 Civ. 671(DLC), 2003 WL 21998052, at *6 (S.D.N.Y. Aug.22, 2003). On November 5, 2003, the SEC filed an amended complaint that included Yoho, a fifth KPMG partner, as a defendant. A Second Amended Complaint (the "Complaint") was filed on May 5, 2004.

In November 2004, KPMG reached a settlement with the SEC. KPMG consented to a finding that it violated Section 10A of the Securities Exchange Act of 1934 (the "Exchange Act"); to pay disgorgement of $9,800,000, plus prejudgment interest; to pay a civil penalty of $10 million; and to implement a number of internal reforms. A final judgment against KPMG was issued on April 20, 2005. In June 2005, defendant Boyle settled with the SEC. The settlement was renewed in October 2005 after an initial rejection by the Commissioners. Pursuant to the settlement, Boyle paid a civil penalty of $100,000 and was permanently enjoined from violat-

ing Exchange Act Section 10A. The final judgment against Boyle was issued on October 11, 2005.

Five claims remain against Conway, Dolanski, Safran, and Yoho (the "KPMG Partners"): (1) violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act") and Section 10(b) of the Exchange Act; (2) aiding and abetting violations of Exchange Act Section 10(b); (3) violation of Exchange Act Section 10A; (4) aiding and abetting violations of Section 13(a) of the Exchange Act; and (5) aiding and abetting violations of Section 13(b) of the Exchange Act. The SEC seeks permanent injunctions and civil penalties against the KPMG Partners.

In June 2005, the KPMG Partners filed the summary judgment motions that are the subject of this Opinion. All four defendants contend that they did not make false or misleading statements on which primary liability under Exchange Act Section 10(b) and Rule 10b–5 could be predicated, and that they face, at most, aiding and abetting liability under Exchange Act Section 20(e). Dolanski and Safran also move on the basis that they made no actionable misstatements that would support Securities Act Section 17(a) liability. All defendants also argue that actual knowledge is necessary to support liability under Section 20(e). Dolanski, Conway, and Yoho argue that the evidence is insufficient to establish that they possessed actual knowledge of the alleged violations.

Conway, Dolanski, and Yoho also argue that they should not be held liable under Exchange Act Section 10A, claiming that the provision does not apply to individual accountants. Conway contends that he should not incur Section 10A liability because he performed an extensive investi-

gation of potential illegal acts by Xerox, reported those acts to the Xerox Audit Committee, and insisted upon appropriate remedial action. Yoho argues that he should not be held liable under Section 10A because there is no reason to believe that he failed to notify the Audit Committee as required under the statute.[1]

Conway and Dolanski argue that, even if they made misstatements sufficient to support Section 10(b) liability, the evidence is not sufficient to support an inference that they had scienter. Dolanski argues additionally that the claims against him under Sections 10A and 20(e) are barred by the statute of limitations, and that he should receive judgment as a matter of law on claims premised on "price increases and extensions to existing leases" because such claims are not asserted against him in the complaint.

Conway has filed a motion to strike certain portions of plaintiff's Response to Mr. Conway's Statement of Material Facts Pursuant to Local Rule 56.1 and the Statement of Facts in plaintiff's opposition brief. That motion is considered at the end of this Opinion.

The following facts are taken from the parties' evidentiary submissions and are either undisputed or stated in the light most favorable to the SEC, unless otherwise noted. The various accounting treatments at issue, including lease accounting methodologies and accounting for reserves, and Dolanski's, Safran's, and Yoho's involvement in them, are described in subsection B. Conway's involvement, and the events that led up to the Second Restatement in 2001, are described in subsection C.

---

1. Yoho also mentions, in one sentence of his memorandum of law, that he is moving for summary judgment on the Exchange Act Sections 13(a) and 13(b) claims against him. The law on these provisions is not briefed in the memorandum, however. Thus, to the extent Yoho intends to move on these grounds, his motion is denied.

**B. The Defendants' Involvement in the Accounting Treatments at Issue**

Financial statements must be reported in accordance with Generally Accepted Accounting Principles, or "GAAP." The meaning of GAAP was explored in detail in this Court's January 18, 2005 Opinion deciding the summary judgment motion of Arthur Andersen LLP in *In re WorldCom, Inc. Securities Litigation*, 352 F.Supp.2d 472, 478–79 (S.D.N.Y.2005), and this Opinion draws heavily from that discussion.

The goal of financial reporting is to "provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions." Financial Accounting Standards Board ("FASB"), Statement of Financial Accounting Concepts No. 1 (1978). The purpose of GAAP is "to increase investor confidence by ensuring transparency and accuracy in financial reporting." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 339 (S.D.N.Y.2004).

There are "19 different GAAP sources." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). When a conflict among these sources arises, "the accountant is directed to consult an elaborate hierarchy of GAAP sources to determine which treatment to follow." *Id.* Standards issued by FASB sit at the top of this hierarchy and are used as reference points by all parties to the summary judgment motions considered in this Opinion. FASB, an independent private sector organization, is the "designated organization in the private sector for establishing standards of financial accounting and reporting." FASB, Facts About FASB, *available* *at* http://www.fasb.org/facts/index.html. FASB's standards have been recognized by the SEC as authoritative. *See* Statement of Policy on the Establishment and Improvement of Accounting Principles and Standards, SEC Release No. AS–150, 1973 WL 149263, at *1 (Dec. 20, 1973).

The SEC offers evidence that Xerox used several improper accounting treatments to distort its reported financial results in the years 1997 through 2000. One of its accounting experts contends that the accounting treatments violated GAAP, and it has presented evidence to show that the purpose and effect of these treatments was artificially to inflate Xerox's reported quarterly earnings to meet the earnings targets that the company had announced to Wall Street. Without these alleged accounting manipulations, Xerox would have missed the consensus earnings predictions made by Wall Street analysts in every quarter from the third quarter of 1997 through the second quarter of 1999. In both the fourth quarter of 1997 and the fourth quarter of 1998, the accounting treatments at issue added over $0.20 to the reported earnings per share. KPMG was aware of the earnings pressures Xerox faced. For example, a 1997 memorandum from KPMG's Rochester audit team noted that "[t]oday's bull market has been fueled by companies' ability to replicate [their] earnings over relatively long periods of time. Xerox Corporation–Rochester is no exception to these pressures. . . ."

Xerox had long been a Fortune 500 Company that maintained a presence in many areas of the world. It was headquartered in Stamford, Connecticut, and had major offices in Rochester, New York; Canada; Great Britain; and Brazil. The KPMG Partners all worked out of KPMG's Stamford office, but there were also KPMG audit teams in Rochester, Canada, Great Britain, and Brazil.

KPMG served as Xerox's independent auditor for forty years, until September 2001. Xerox was an important client for KPMG. During the years 1997 through 2000, KPMG received $23 million in audit

fees and $56 million in consulting fees from the company. The responsibilities of an auditor were outlined in detail in *World-Com*, 352 F.Supp.2d at 479–82. In conducting an audit, an auditor must follow the standards that constitute Generally Accepted Auditing Standards, or GAAS. The American Institute of Certified Public Accountants created the ten GAAS standards. *See* Codification of Accounting Standards and Procedures, Statement on Auditing Standards No. 1, § 150 (American Inst. of Certified Pub. Accountants 2001). Compliance with GAAS is mandatory. *WorldCom*, 352 F.Supp.2d at 479 (citing AU § 161.01).[2]

KPMG's audit certifications for the years in question represented that Xerox's annual financial statements presented fairly, in all material respects and in accordance with GAAP, the company's financial position, and that KPMG's audits had been conducted in accordance with GAAS. The SEC disputes both the propriety of the accounting treatments and the adequacy of KPMG's investigation and approval of those treatments, and contends that the audit certifications thus constituted misstatements of fact.

Dolanski was the KPMG engagement partner who supervised the 1997 audit of Xerox's financials; he had served as engagement partner for Xerox since 1995. Yoho was the concurring review partner on KPMG's audits of Xerox for 1997, 1998, 1999, and 2000; he, too, had served Xerox in his position since 1995. Dolanski retired after the 1997 audit and was replaced by Safran, who oversaw the 1998 and 1999 audits. Conway replaced Safran as engagement partner after the 1999 audit, at Xerox's insistence, and was responsible for supervising the 2000 audit.

In opposing summary judgment, the SEC has emphasized those accounting treatments that apply to "bundled leases" and loss contingency reserves. The accounting treatments at issue, and the evidence presented by the SEC regarding the KPMG Partners' knowledge and approval of those accounting treatments in the years 1997 through 1999, are summarized directly below. Events beginning in 2000, the year in which the SEC began its investigation of Xerox's accounting practices, are discussed *infra*.

### 1. Accounting for Leases

During the period from 1997 through 2000, bundled leases accounted for the majority of Xerox's sales revenue. Under a bundled lease, a customer pays a single negotiated monthly fee for photocopier equipment, servicing, and financing. Xerox's bundled lease contracts did not specify how a customer's monthly fee was allocated among the various components of the lease package. That is, customers and competitors could not determine what percentage of a lease price was allocable to the cost of equipment, as opposed to service or financing. Internally, however, Xerox operating units assigned a value to each of these lease components in the company's sales data entry system close to the time a lease was negotiated. Xerox's sales data entry system in the United States is known as "ValueQuix." [3]

Xerox claimed that ValueQuix overstated finance revenue and understated equipment revenue. Beginning in 1997, the company also claimed that ValueQuix overstated service revenue in Europe and, later, in Latin America, also with the effect of understating equipment revenue. Dur-

---

2. GAAS and the related Statements on Auditing Standards are here cited as AU § ___, as is the practice within the accounting industry.

3. For ease, this Opinion will refer to all such data entry systems, in the United States and abroad, collectively as ValueQuix.

ing the years in question, rather than simply carrying the lease price components as entered on ValueQuix through to the company's top-level financial reporting, Xerox made topside adjustments to its reported lease revenues. It justified these adjustments with reference to the distortions that allegedly inhered in the ValueQuix system, but the accounting techniques had the overall effect of advancing the recognition of revenues for the company in a manner that nudged the company's current earnings toward its projected earnings goals. The SEC presents evidence that the KPMG Partners understood that these accounting techniques were used by Xerox to meet the company's short-term earnings targets rather than to offset the effects of distorted allocations in Value-Quix.

According to one of the SEC's accounting experts, D. Paul Regan ("Regan"), a topside adjustment "modif[ies] the reported results of underlying systems, accounting processes, or accounting records maintained in the normal course of day-to-day business activity." Topside adjustments may be legitimate, but they are prone to abuse—a concern that Safran voiced in a March 15, 1999 memorandum to Xerox's chief financial officer. Safran warned:

> *Accounting and internal control risks are heightened when top-level adjustments are used* in lieu of transaction-based accounting which can be controlled locally. We recommend that the additional use of top-level adjustments be curtailed until systems and record-keeping capabilities are developed to record such adjustments at the transaction level on local books where the accounting records can be effectively monitored and prudently controlled.

(Emphasis supplied.)

Two forms of topside adjustments Xerox made to its lease revenues were "return on equity," or "ROE," adjustments, which reallocated a portion of financing income to equipment revenue, and "margin normalization" adjustments, which reallocated a portion of service income to equipment revenue. Xerox also made topside adjustments that advanced the recognition of revenues and earnings attributable to price increases and extensions of existing leases, and retroactively increased the residual values of leased equipment.

### a. Return on Equity (ROE)

The authoritative statement on GAAP-compliant financial accounting and reporting for leases is FASB, Statement of Financial Accounting Standards No. 13: Accounting for Leases (Fin. Accounting Standards Bd.1976) ("FAS 13"). FAS 13 requires a company to recognize revenue from the fair value of the leased equipment in the reporting period in which a lease commences. Service and financing revenues, on the other hand, are recognized ratably over the lease period. FAS 13 defines the "fair value" of leased equipment as "the price for which the property could be sold in an arm's-length transaction between unrelated parties." FAS 13, ¶ 5(c). FAS 13 further specifies that fair value at the inception of a lease "will ordinarily be its normal selling price, reflecting any volume or trade discounts that may be applicable." *Id.* ¶ 5(c)(I). The "interest rate implicit in the lease" is determined, in broad terms, by calculating the interest rate that would account for the difference between the fair value of the lease equipment, less the unguaranteed residual value of the equipment that will be recouped by the lessor at the end of the lease term, and the actual lease payment amount.[4] *See id.* ¶¶ 5(k), 100.

---

4. FAS 13 describes the implicit interest rate as

> The discount rate that, when applied to (i) the minimum lease payments ... excluding that portion of the payments representing

The SEC's evidence indicates that, near the end of financial reporting periods, Xerox management made topside adjustments allocating a larger percentage of the aggregate bundled lease revenues to the equity value of the equipment than could actually be supported by objective sales data. Rather than using the fair value of the copier equipment as a starting point, Xerox determined that it would back into its equipment value from an interest rate figure and derive the interest rate figure from another arbitrary figure. After conducting a survey of the reported ROE of the financing units of other companies,[5] Xerox calculated an interest rate that would create a total annual ROE of 15% for Xerox's finance subsidiary, Xerox Credit Corporation. Xerox's operating units then derived their reported equipment revenues from the contrived ROE figure rather than by reference to the equipment allocations entered in Value-Quix or some other objective data point such as cash sales of Xerox's copier equipment—essentially allowing the tail to wag the dog. The ROE formula applied across Xerox's worldwide operations, even in countries such as Brazil, where skyrocketing inflation meant that market rates of financing were much higher than those calculated pursuant to the ROE figure. Xerox also reallocated revenues from lease transactions that had already been reported, which is itself a GAAP violation. Altogether, the SEC maintains that Xerox manipulated its ROE formula to pull forward a total of $303.5 million in additional reported earnings in 1997 through 2000.

The SEC provides evidence from which it could be inferred that Dolanski knew as early as 1995 that the Xerox's topside ROE adjustment was not in accordance with GAAP, the year in which Xerox lowered its ROE target from 18% to 15%. It also points to a number of later KPMG-generated documents that express significant reservations about the ROE method. For example, in its 1996 management letter to Xerox, KPMG told the company that its topside ROE adjustments were not an "appropriate and prudent accounting practice." A KPMG memorandum of November 6, 1996, on which Dolanski was copied, states that "[t]he formula used to determine the rate charged by the finance company to the marketing company has been changed (usually resulting in a lower rate and higher sales revenue)" and that "[t]he marketing companies are allowed to 're-cast' the rates after the leases have been booked." The memorandum recommends that "the formula for the finance rate should be specifically defined and marketing companies should not be allowed to adjust the rates once the leases have been booked." A February 7, 1997 memorandum to Xerox management from KPMG's Rochester office, and copied to Dolanski, recommended that the ROE adjustment be discontinued. Yoho testified in his deposition that the ROE adjustment was a "significant issue" in the 1997 audit. The 1997 Xerox Completion Memorandum, signed by both Dolanski and Yoho, contains no discussion of the ROE methodology.

---

executory costs to be paid by the lessor, together with any profit thereon, and (ii) the unguaranteed residual value ... accruing to the benefit of the lessor, causes the aggregate present value at the beginning of the lease term to be equal to the fair value of the leased property ... to the lessor at the inception of the lease, minus any investment tax credit retained by the lessor and

expected to be realized by him. (This definition does not necessarily purport to include all the factors that a lessor might recognize in determining his rate of return....)
FAS 13, ¶ 5(k).

5. The SEC also offers evidence that impugns the merits of this survey, and by implication, the bona fides of those who relied on it.

In 1998, Xerox applied an even lower interest rate to its sales leases to maintain the 15% ROE. It also expanded its use of the ROE adjustment to leases recorded by Xerox Business Services, a unit to which the ROE method had not formerly been applied. Safran stated at his deposition that he understood that the reason the latter change was made as a topside adjustment was that "the transactions at the initial point of entry did not reflect fair value" due to declining interest rates.

It also became evident in 1998 that Xerox was applying the ROE methodology to the accounting for Xerox's operations in other areas of the world.[6] Safran admitted at his deposition that he was concerned that, at Xerox Brazil, the discount rate being used as a result of the ROE model was too low. He had been told by KPMG Rio de Janeiro ("KPMG Rio") that there were concerns over this issue. KPMG's 1998 Final Issues Memorandum for Xerox Europe stated that the ROE adjustment, which had been implemented there in 1998, had " 'pull[ed] forward' $85.1 million . . . of unearned finance income as sales revenue."

In 1999, Xerox's ROE methodology in Brazil was producing untenable results. An April 1999 memorandum from KPMG Rio to Safran noted that, in March 1998, the interest rate implicit in the lease contracts had been adjusted from 7% to 6% to produce the 15% ROE, and that in April 1999, a 0% interest rate would be necessary to produce such an ROE. The memo states that "KPMG's position is that a 0% interest rate does not cause the aggregate present value of the leases entered into in 1999 to be equal to the fair value of the leased property to the lessor at the inception of the lease and, consequently, we have included the adjustment as an audit difference." [7] At the end of the year, the interest rate for all quarters was adjusted back to 6%, an amount still far below the prevailing interest rates in Brazil at the time. The KPMG Europe audit team noted in its 1999 Year End Sign–Off Memorandum that Xerox Europe had been instructed to make a topside adjustment to reflect a 15% ROE for all 1998 leases, but that Xerox Europe "ha[d] not carried out its own benchmarking to determine whether a 15% ROE is appropriate to its operations on a stand alone basis." The memorandum acknowledges that the ROE method pulled forward $38 million in revenue for the year. Despite these concerns, no scrutiny of the ROE method is reflected in either KPMG's 1999 Audit Plan for Xerox or its Completion Memorandum for the year.

b. Margin Normalization

Xerox's margin normalization adjustments affected the company's reported revenue in the same manner as the ROE adjustments, but involved the accounting treatment of the service portions of bundled leases rather than the financing portions. The first margin normalization adjustments were made by Xerox Limited, Xerox's European subsidiary ("Xerox Europe") in 1997. Through this adjustment, Xerox applied the lower margins on service that existed in the United States to the European market, despite any difference in the competitive environment. By increasing the portion of the lease amount allocated to the value of the equipment, rather than to anticipated service revenues, Xerox was able to advance

---

**6.** KPMG's 1997 Audit Issues Memorandum for Xerox noted that Xerox Canada had adopted the ROE methodology in 1996.

**7.** An auditor compiles a summary of audit differences "documenting differences between [the issuer's] numbers and [the auditor's] conclusions." *In re IKON Office Solutions, Inc.,* 277 F.3d 658, 676 (3d Cir.2002).

the recognition of revenue in its financial statements. The adjustments resulted in equipment margins that were significantly higher than service margins, even though Xerox knew that, at least in the United States, equipment margins were declining. A series of twenty-three margin normalization adjustments, of which fourteen increased equipment revenue, bolstered Xerox's revenues by $550.7 million, and pretax earnings by $321.3 million, in 1997 through 2000.

Yoho testified that the margin normalization adjustment for Xerox Europe was identified as a "significant" issue for the 1997 audit. Several documents issued by KPMG UK during this period express skepticism as to whether the adjustment was appropriate or anything other than arbitrary. For example, the 1997 Final Issues Memorandum regarding Xerox Europe describes the margin normalization adjustment in connection with its description of unadjusted audit differences and begins by stating that "evidence does support the view that there is an inherent structural bias in the accounting which favours service margin," the claimed justification for the adjustment. It explains that "[t]he margins currently achieved are largely determined by the allocation of revenue which, given contracts are negotiated on a total cost basis, is potentially arbitrary." The memorandum adds that "the concept behind the normalization adjustment is sound," and that "the base data used for the calculations is robust." Nevertheless, the memorandum concludes "that any such adjustment undertaken centrally without [operating company] management input is *inherently less reliable* than data produced on a contract by contract basis using actual operations data." (Emphasis supplied.) The SEC also submits evidence that Dolanski decided that the margin normalization adjustment would be treated as a "quality of earnings" issue rather than an audit difference.[8] KPMG's 1997 Xerox Completion Memorandum describes the adjustment but states that it "appears appropriate and . . . is supported by a detailed calculation."

KPMG's 1998 Xerox Completion Memorandum ("1998 Completion Memorandum"), signed by Safran and Yoho, recognized that top-side adjustments for KPMG Europe, most of which were attributable to the margin normalization adjustment, totaled $198 million. The 1998 Completion Memorandum further cautions that "[t]he risk of a material financial statement error remains low, but will increase over time unless processes are established to push down these top level adjustments to the contract level." It concluded, "[t]his could create a reportable condition in the future." Safran told KPMG's European audit team that he was worried that "there is too much judgement applied in the process [of making margin normalization adjustments], and the habit of periodic adjustment of the formula when needed is driven by the wrong motives."

KPMG's 1998 Completion Memorandum recognizes that the margin normalization adjustments made for Xerox Europe and, beginning in that year, Xerox Brazil had the effect of advancing over $72 million in revenue, and that certain adjustments made in the fourth quarter of 1998 applied retrospectively to the beginning of the year. That memorandum acknowledges that some of the adjustments were inappropriate in interim quarters but concludes that the annual financial statements are properly stated. "From a KPMG reporting standpoint, we evaluated the materiality of this misuse of facts during inter-

---

8. At his deposition, Dolanski testified that "quality of earnings" issues were "[s]ignificant or unusual items."

im periods in relation to income for the full year and determined that it is not material to income or the trend of income." Notes from a January 1, 1999 conference call between Safran and a member of the audit team for KPMG Brazil indicate that Safran stated "that when [adjustments] are made retroactively to other quarters this has to be treated as an audit difference." Safran also stated "that [KPMG] must obtain reference data for the adjustment. When this can not be obtained it must be included as an audit difference."

Xerox made more dramatic margin normalization adjustments in 1999. Safran confirmed at his deposition that Xerox intended to change the allocation such that equipment margins would exceed service margins by 17% in Brazil and Mexico, where the methodology was implemented at the end of 1999. In Europe, Xerox applied margin normalization even to contracts that explicitly specified the allocations devoted to equipment and service. KPMG auditors in Europe, Brazil, and Mexico all expressed reservations about the application of the margin normalization methodology in their countries.

The third quarter Completion Memorandum for 1999, signed by Safran and Yoho, states that "[d]uring the third quarter ... Xerox Europe made adjustments to the allocation methodologies for certain contracts that were recorded during the quarter and earlier in the year." It acknowledges that

*we considered whether management had properly applied accounting principles* related to changes in estimates during interim quarters of 1999 *and determined that they had not.* ... Our conclusion, however, is that the annual financial

statements will be properly stated, and there is no audit difference. From a KPMG reporting standpoint, we evaluated the materiality of this misuse of facts during interim periods in relation to income for the full year and determined that it is not material to income or the trend of income.

(Emphasis added.)

KPMG's 1999 Completion Memorandum contains a detailed discussion of margin normalization. It states:

In 1997, Xerox initiated a central margin normalization adjustment within Xerox Europe to bring sales and service margins in line with management's view of the commercial realities of the business and to better conform worldwide practices. During 1998 and 1999, Xerox Europe and Xerox of Brazil made adjustments, at Corporate direction, to the allocation methodologies for certain contracts that were recorded earlier in the year. The methodology was also initiated in Mexico in Q4 1999. These adjustments were made to obtain greater consistency in the worldwide process of revenue bifurcation results, and because local and Corporate management collectively concluded that changes occurring in pricing and competitive factors in the marketplace had caused a distortion of revenue allocations from fair value. The 1999 adjustments in Brazil and Mexico were made on a prospective basis at the time they were recorded. Europe's adjustments were recorded on a retroactive basis to the beginning of 1999.

The 1999 Completion Memorandum goes on to offer a series of general recommendations for testing the propriety of the margin normalization adjustment.[9] It rec-

---

9. For example, the memorandum states:
 Management's monitoring mechanisms should continuously reaffirm that:
 — Objective data from independently negotiated transactions is used in the rev-

enue allocation processes whenever it is available.
 — Global data and other reference data used as a surrogate for market-specific

ognizes that "[i]deally, adjustments should be allocated to the contract level to ensure accurate monitoring. We understand that at the current time systems limitations preclude this."

By this time, Safran was becoming more assertive in voicing his misgivings about some of the dubious topside adjustments made by Xerox, especially the margin normalization adjustment. A January 23, 2000 e-mail to Yoho, Conway, and Boyle indicates that Safran believed Xerox was manipulating its financial reporting specifically to meet earnings projections, and that the company was pressuring its auditors in the process. Safran advocated that these issues be raised with the Audit Committee of Xerox's board of directors:

> I believe that it is a must (a professional obligation under SAS 61)[10] that we discuss the "[u]ndue time pressure" issue with the audit committee.... The undue time pressures are the result of both the 1) pressures in their current environment (the need for quarter end transactions to "bridge the gap"), and 2) stresses of the accounting model (Brazil) and they are also too often intentional on the part of management (example: Q4 margin normalization), and this needs be said.

Safran expressed worry that the Xerox–KPMG relationship has been "strained" due to KPMG's "waffling on issues," and emphasizes that the "waffling" should be attributed to the time pressures intentionally placed on KPMG by Xerox management. Neither the management pressures nor the disputed accounting treatments were apparently raised with the Audit Committee during this time period, however. At his deposition, Safran admits that he had concerns about maintaining the Xerox relationship. A January 19, 2000 e-mail from Safran to Yoho states that "it would be management's preference that we simply say that there are no audit differences."

Ultimately, in its 1999 year-end reporting, Xerox made "adjustments" to the 17% margin differential that was originally its target in Mexico and Brazil, decreasing the magnitude of the company's margin normalization adjustment for the year. At deposition, Safran described the size of these scale-backs as "substantial relative to the amounts that had been proposed" but admitted that they did not reverse the entirety of the margin normalization adjustment in those countries in the fourth quarter.

### c. Price Increases and Lease Extensions

FASB, Statement of Financial Accounting Standards No. 27: Classification of Renewals or Extensions of Existing Sales–Type or Direct Financing Leases (1979) ("FAS 27") is a brief amendment of FAS 13. It provides, in relevant part: "A renewal or extension of an existing sales-type ... lease ... shall be classified as a direct financing lease unless the renewal or extension occurs at or near the end of the original term specified in the existing lease...." *Id.* ¶ 6. The significance of this classification is that revenue from a renew-

---

indicators of fair value is relevant, accurate and reliable.
— Shifts in the level of sales or service margins are reflected in the methodologies on a timely basis and do not lag.
— Documentation supporting management's conclusions is prepared contemporaneously.

The memorandum also recommends that "[p]rior to the implementation of new revenue allocation methods, local management teams should rigorously evaluate whether appropriate objective indicators for fair value exist ... *in the determination of key assumptions, and in the analytical review of results.*"

**10.** *See* AU § 380.

al or extension must be recognized over the term of the lease as financing revenue, unless the extension is negotiated at or near the end of the lease. Revenue from any price increases to existing leases must be recognized over the lease term as well:

> If the provisions of a lease are changed in a way that changes the amount of the remaining minimum lease payments ... the balance of the minimum lease payments receivable and the estimated residual value, if affected, shall be adjusted to reflect the change ... and the net adjustment shall be charged or credited to unearned income.

FAS 13 ¶ 17(f)(i).[11] The SEC presents evidence that Xerox improperly advanced the recognition of revenues and earnings attributable to price increases and extensions of existing leases, recognizing such revenues in the periods in which the increases and extensions were first negotiated rather than ratably over the lease term. This accounting tactic was used primarily in Xerox's Brazil operations.

A memorandum expressing doubt as to the propriety of the adjustments for price increases and lease extensions was copied to Dolanski in November 1996. Later, KPMG Rochester's reservations about the adjustments were reflected in an exhibit entitled "Summary of GAAP Departures" attached to the Xerox 1999 Rochester Operations Final Signoff Memorandum, which was addressed to Safran. The exhibit recognizes that "[a]ccording to FAS 13, incremental sale revenue cannot be recognized on contracts that renew before the end of the original lease term nor on equipment if it is in the last 25% of its economic life." The document notes that the impact of these adjustments had been $37.3 million in 1998 and $46.5 million in 1999. It concludes, however, that the company's use of the accounting treatment was "[i]mmaterial to the worldwide consolidated financial statements taken as a whole."

As noted in KPMG's 1999 Completion Memorandum, in the first two quarters of 1999, Xerox Brazil recognized a great deal of revenue, although those amounts were reversed in Xerox's audited financial statements at the end of the year. The memorandum notes that the accounting treatment of contract extensions in Xerox Brazil did not comply with GAAP. It states:

> During the first and second quarters of 1999 Xerox Brazil took operational measures to recover the economic consequences of the devaluation of the Brazilian Real by repricing certain contracts and amending certain contracts through extensions. *The increase* in net-present-value associated with a portion of these rent adjustments *was recognized immediately as revenue* in accordance with Xerox's historical practices. *Under GAAP rent adjustments* on sales-type leases that result from inflation adjustments, renegotiations of prices, and extensions *must be recognized in income over the remaining life of the leases as additional finance income.* Historically, the effect of the differences between Xerox policy and GAAP have been considered immaterial.

(Emphasis supplied.) It states that the current Xerox policy was created because Xerox considered it to be "a fairer presentation of the results of the business" because the GAAP treatment "result[ed] in unrealistic finance returns on the finance business." The memorandum notes that Xerox made first-quarter adjust-

---

**11.** This provision is not cited by the SEC but appears to be applicable. By its express terms, FAS 27 does not amend the provisions of FAS 13 that apply to "the classification of a lease that results from a change in the provisions of an existing lease or the accounting for changes in the provisions of a lease if those changes occur during the lease term."

ments in 1999 "to reduce the impact of the departure from GAAP to an amount that management, with KPMG's concurrence, determined was immaterial," but that "[p]retax income would have been reduced further by approximately $50 million in Q1 and Q2 of 1999 if [Xerox Brazil's] accounting fully conformed to GAAP." It states, however, that on December 31, 1999, Xerox "recorded an adjustment of $34 million to reverse the 1999 income statement impact of the above-mentioned revenue recognition issues for Brazil. This amount represents the estimated balance sheet impact of revenue overstatements that had not [been] reversed as of December 31, 1999." The memorandum nevertheless cautions that "[d]uring the 1999 audit, we· noted an unacceptably high level of contracts [by Xerox Brazil] that did not meet minimum requirements under GAAP for revenue recognition" and that it was unclear whether additional controls adopted during the second half of 1999 would reduce risks to an "acceptable level" in the future. KPMG warned of the pressures facing Xerox Brazil in its 1999 management letter as well. This management letter was copied to the Audit Committee of Xerox's board of directors.

The SEC points to a draft memorandum regarding "First Quarter Lease Modifications in Brazil" showing that KPMG auditors, including Yoho, knew that the recognition of revenue from price uplifts and lease extensions did not conform to GAAP. It indicates that KPMG suggested that Xerox reduce the overstatement of current revenue to an amount representing less than 5% of consolidated income. Next to the 5% figure is a handwritten notation by Yoho: "Do we want this in writing?"

### d. Retroactive Increases to Residual Values of Leased Equipment

The "estimated fair value of the leased property at the end of a lease term" is known as the "residual value." FAS 13 ¶ 5(h). FAS 13 flatly provides that "[a]n upward adjustment of the estimated residual value shall not be made." *Id.* ¶ 17(d). Xerox increased residual values retroactively, albeit within the year in which the leases originated.

The SEC presents clear evidence that Dolanski knew of the upward adjustments to residual values, including an internal e-mail message from a Xerox officer stating that Dolanski "had finally albeit with some reluctance[ ] accepted the practice of backdating residual value recognition within the same year." The e-mail message describes the argument over the issue as "heated." Safran indicated at deposition that retroactive increases to residual values were among his concerns as well. He stated that he did not, however, view these adjustments as inconsistent with GAAP.

### 2. Loss Contingency Reserves

A second set of accounting manipulations relates to the improper creation and release of reserves. Under GAAP, a company must set up a loss contingency reserve if a future loss is both probable and reasonably estimable. *See* Statement of Financial Accounting Standards No. 5: Accounting for Contingencies ¶ 8 (Fin. Accounting Standards Bd.1975) ("FAS 5").[12]

---

**12.** FAS 5 provides:

An estimated loss from a loss contingency ... shall be accrued by a charge to income if *both* of the following conditions are met:
 a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
 b. The amount of the loss can be reasonably estimated.
FAS 5 ¶ 8 (emphasis in original).

When such a reserve is created, it is charged to current earnings; when the anticipated loss occurs, it is charged to the reserve. When a reserve is created without a sufficient likelihood that the relevant expense will be incurred, it permits a company to draw on the reserve to cover expenses for which the reserve was not created and thereby artificially boost its earnings in subsequent reporting periods.

The SEC submits evidence regarding a number of excess, or "cushion," reserves that it contends were improperly maintained or released by Xerox. One particular reserve, of $100 million, was created pursuant to Xerox's 1997 acquisition of the 10% outstanding ownership interest in Rank Xerox, Xerox's European subsidiary, which was renamed Xerox Limited (the "Rank Reserve"). KPMG's due diligence report for the acquisition concluded that the risk of future tax liability stemming from the acquisition, the contingency for which the Rank Reserve was ostensibly created, was remote at the time of the transaction and thus did not justify the creation of the Rank Reserve in the first instance. Xerox drew down on that reserve in 1998 and 1999 for purposes unrelated to the stated purpose of the reserve.

The SEC provides evidence that both Dolanski and Yoho knew of the existence of the unspecified excess reserves. Yoho, for example, admitted at his deposition that he knew in 1997 that Xerox maintained such reserves, but stated that they would not have caused him concern "so long as [they were] considered as an audit difference and evaluated for materiality." The 1997 Summary Audit Plan prepared by KPMG Rochester headed a chart showing amounts of reserve releases and other "accounting actions" in 1995, 1996, and 1997 with the statement "the pressure to maintain favorable earnings trends and increase the stock price is a top priority of public companies."

Testimony by Xerox officers suggests that creation of the $100 million Rank Reserve in 1997 was Dolanski's idea. At deposition, Yoho testified that he had knowledge of the Rank Reserve beginning at the end of 1998 or early 1999. He also testified that he believed the improper releases from the Rank Reserve had been corrected in 1999. Safran testified that he became aware of the take-downs of the Rank Reserve in 1999. KPMG's 1999 Audit Completion Memorandum acknowledges the impropriety of Xerox's releases from the Rank Reserve beginning in the last quarter of 1998, but concludes that they were not material:

> During our audit procedures in Q4'99 it came to our attention that Xerox had implemented a policy, effective in Q4'98, to charge costs which were not allowed to be charged to the 1998 Restructuring Program to this liability. Approximately $23 million and $77 million of costs which benefit ongoing operations (and are therefore prohibited from being charged against the established restructuring reserve ...) were charged in Q4 of 1998 and throughout the four quarters of 1999, respectively.

> *We concluded that the charges against the Rank purchase reserve were inappropriate* ....

> We have included the $77 million charged in 1999 in our net P & L impact approach to the determining [of] quarterly reporting disclosure and potential restatement materiality.... This issue does not affect the audit differences impacting the 12/31/99 balance sheet since no liability remains.

(Emphasis supplied.)

3. Xerox's Fortunes Decline

In August 1999, Xerox's CFO, Barry Romeril ("Romeril"), complained to the chairman of KPMG that Safran had de-

manded that the company make a last-minute change to quarterly results. Romeril testified that he complained due to Safran's "indecisiveness" and "changing positions." Among the issues about which Romeril perceived that Safran was indecisive was the accounting for price increases and lease extensions at Xerox Brazil. Subsequently, Safran was transferred off of the audit team and eventually assigned to an engagement auditing another client. KPMG replaced Safran with Conway. It was agreed that Safran would complete the 1999 audit of Xerox's financials, however. Yoho continued on as KPMG's concurring review partner. Beginning in the third quarter of 1999, Xerox began missing its earnings expectations.

As noted above, in early 2000, Safran and Yoho discussed taking their concerns about communication with management and certain accounting treatments to Xerox's Audit Committee. Safran testifies that it was determined that the concerns regarding time pressure imposed by management would be brought up before the Audit Committee in May by Conway and Yoho. The Audit Committee meeting minutes do not reflect any such discussion.

In August 2000, a Xerox treasury office employee named James F. Bingham, who worked primarily on Xerox Brazil, wrote a memorandum in preparation for a meeting with Romeril and other Xerox executives. Bingham had apparently been put on suspension by Xerox for "insubordinate conduct" sometime prior to July 2000. The memorandum asserted that the interest rates assigned to leases in Xerox's Latin American operations were "significantly different from pricing assumptions used" and that "the local interest rates—the most verifiable part of the estimation process—are ignored." He further contended

that "[n]o one at Xerox believes the resulting answer as it diverges so far from economic reality." Bingham cited other dubious accounting practices, including the creation of the Rank Reserve, and spoke of a domineering attitude among Xerox management. He stated: "Accounting estimates have become more aggressive over time and accounting actions . . . have become increasingly directed from Corporate Headquarters." Similarly, "[o]ur non-financial management has excessive knowledge of and participation in accounting action ideas—accounting tasks are actually given by management. Seemingly everyone in Xerox has become an accountant." Further, "[s]ome high-level management openly jokes about Xerox accounting practices while being bonused on the same."

An unsigned "Memorandum to the Files" dated "5/01," which appears to have been drafted by a KPMG representative,[13] indicates that Bingham's termination was discussed in a Xerox Audit Committee meeting on September 7, 2000. After viewing the minutes of that meeting, KPMG requested a copy of Bingham's memorandum. Romeril told KPMG that Bingham's comments were attributable to the fact that Bingham was a disgruntled former employee and was attempting to extract a settlement from Xerox. It notes, however, that Bingham had not yet filed any lawsuit against Xerox at the time of his meeting with Romeril. The KPMG memorandum further indicates that KPMG was provided a copy of all documents related to Bingham's firing. The deposition of Paul Knopp, another partner at KPMG who was functioning as an engagement partner along with Conway, indicates that he traveled to the United Kingdom, Rochester, and Brazil in Octo-

---

**13.** The SEC's Response to Defendant Michael Conway's Statement of Material Facts Pursuant to Local Rule 56.1 indicates that the memorandum to files was written by Paul Knopp.

ber and November 2000, and inquired about the contents of Bingham's memorandum. There is no indication, however, that anyone at KPMG ever questioned Bingham personally. Conway and other KPMG representatives discussed Bingham's allegations with the Xerox Audit Committee on February 23, 2001. The minutes of that meeting state that, in a private session between KPMG and the Audit Committee, KPMG noted that Bingham's allegations "[did] not comment on the utilization of the [Rank] [R]eserve.... KPMG commented that in connection with the 1999 audit, KPMG had assessed the materiality of this issue and concluded that it did not create a material misstatement in the context of the consolidated financial statements taken as a whole."

In the second and third quarters of 2000, Xerox recorded a $170 million charge relating to its Mexican operations after an internal investigation initiated by Xerox and performed by the law firm Akin, Gump, Strauss, Hauer & Feld LLP and the accounting firm PricewaterhouseCoopers ("PwC"). The December 8, 2000 report issued by the investigating firms stated that the errors and irregularities at issue occurred from 1996 to 2000, and that the majority of the misstatements happened in 1997 and 1998. A KPMG memorandum from December 30, 2000 reflects that KPMG was kept apprised of the progress of the investigation.

In 2000, apparently for the first time, KPMG examined whether the equipment prices recorded in the ValueQuix system were reasonable for that year for "Xerox–NASG (Rochester operations)," a term which apparently refers to Xerox's North American operations. KPMG Rochester concluded that "it appears that service and equipment revenue is reasonably allocated on bundled lease contracts." In making its assessment, the KPMG Rochester team considered "[h]istorical pricing for similar product types," "[o]btaining competitive proposals on similar products," "[r]eviewing quarterly sales activity to evaluate how the marketplace is reacting to current pricing," and "[r]eceiving field intelligence regarding customer responses to pricing." The same memorandum appears to conclude that the implicit interest rates yielded by the ROE adjustment were reasonable, however. Conway reported KPMG Rochester's assessment to Xerox management on January 23, 2001.

In November 2000, KPMG's work papers relating to Xerox were subpoenaed by the SEC. Xerox made a presentation to the SEC regarding the ROE and margin normalization adjustments in December. KPMG received the minutes of a Xerox Audit Committee meeting of December 2, 2000 reflecting the developments in regard to Xerox. The SEC subpoenaed the testimony of Safran and several other KPMG employees on January 22, 2001.

Beginning in February 2001, Yoho conducted a review of Xerox's accounting practices. One of the resulting reports, by a KPMG partner named Leslie Coolidge, dated March 22, 2001 and addressed to Yoho, expresses doubts regarding Xerox's treatment of bundled leases by its Rochester operations. Coolidge stated that "the audit approach for the Rochester operations is to test the application of policies which have been agreed to in prior years or have been mandated by Corporate without documenting the appropriateness of the policies. Examples include margin normalization...." Coolidge also notes in respect to margin normalization that "[o]ur analysis shows that Xerox's rates were historically below prime, but the spread below prime had increased as their credit worsened.... I believe this analysis was removed from the work papers, but we have not been successful in documenting in the work papers that this

approach is reasonable." A memorandum of March 2001 from Derek T. Barnes, another KPMG partner, noted that Barnes had visited KPMG Brazil and concluded:

it is apparent from the engagement partner's memo that the audit approach was to test the mechanics of Xerox Brazil's application to the lease accounting entries of the various percentage rates [generated by the margin normalization and ROE adjustments] indicated by Xerox Corporation. However, my reading of the memoranda and my discussion with engagement personnel make it clear that the evaluation of *the appropriateness of those rates in the lease accounting of Xerox Brazil was a matter to be addressed by KPMG Stamford.*

(Emphasis supplied.)

In March 2001, Safran testified before the SEC. During his testimony, the SEC confronted Safran with two internal Xerox documents, including an October 28, 1999 memorandum to Romeril from another Xerox executive stating that "the operational results [in North America and Europe] have been deteriorating since 1995 and are very different than the reported results." Attached was a graph entitled "Xerox Europe Product Evolution" that showed a significant divergence between "underlying" and "reported" results beginning in 1996. The second document is a September 7, 2000 memorandum from the president of Xerox's Latin American operations that seems to be addressed to an executive at Xerox Brazil. That memorandum begins: "As you know, our Company is in crisis. What you may not know is that we now face significant gaps in Q3 both to profit and cash.... We simply must do everything that we can to help Xerox deliver its Q3 commitment...." An attachment listed a number of "non-marketing actions" that apparently augmented the revenues of Xerox Brazil. Safran responded that the documents were "inconsistent with any of the representations that had been previously made to us."

On March 14, 2001, Conway told Xerox management that KPMG would not issue its audit letter until it reviewed additional internal Xerox documents that had been produced to the SEC. KPMG and Xerox's legal counsel reviewed the documents on March 23. Conway, Knopp, and another KPMG partner met with Xerox executives, including Romeril, in the subsequent days. On March 25, Conway and Knopp informed Xerox that "after considering both the information in certain of the documents and the explanations by Xerox representatives, management should prepare for the likelihood that KPMG would not be in a position to render [its] opinion on the [Xerox's 2000] consolidated financial statements before the filing deadline." They also decided that a meeting with the Xerox Audit Committee was necessary.

In the resulting meeting with the Xerox Audit Committee, which took place on March 27, 2001, KPMG discussed the Xerox documents and recommended that an internal investigation of Xerox's accounting practices be conducted. Thomas Theobold ("Theobold"), the chairman of the Audit Committee, testified at his deposition that the reaction of the committee was "[W]hy now do we need an investigation? What's different? What have you come across?" He stated that the committee viewed KPMG's concern for its own exposure to be "a factor" in the auditor's demand for an investigation. Theobold noted that a lawyer for KPMG was present, "which they had never had at a meeting beforehand."

The Audit Committee retained the law firm of Paul, Weiss, Rifkind, Wharton and Garrison ("Paul Weiss") to perform the internal investigation; it in turn retained PwC. Xerox management also retained the law firm of Skadden, Arps, Slate, Meagher

& Flom ("Skadden"), which hired a PwC team led by a different partner. The report issued at the conclusion of the Paul Weiss–PwC investigation stated that "Xerox' reported results of operations were significantly influenced by changes in accounting estimates and practices as well as 'one-time' practices which were used to 'close the gap,' that is, to minimize the difference between planned and actual financial results." It found, however, that the margin normalization adjustments generally complied with GAAP. The report concluded that the ROE adjustments generally produced results consistent with GAAP, with the exception of certain retrospective adjustments in Latin America and the zero-percent discount rate the ROE methodology produced in Brazil in 1999. It cited the establishment and take-down of the Rank Reserve, the existence of "cushion" reserves, and the retrospective adjustments to net residual values as inconsistent with GAAP. Harvey Kelly, the PwC partner conducting the Paul Weiss–PwC investigation, separately recommended that Xerox abandon the margin normalization and ROE adjustments.

A draft of the report issued by PwC on May 10, 2001 as a product of the Skadden–PwC investigation instituted by Xerox management responded to Bingham's allegations, as well as the SEC investigation. That report concluded:

> Xerox' accounting for sales-type leases, in respect of "margin normalization" and "ROE" adjustment estimates and the fair values allocated to lease elements comports with GAAP. The estimates made of allocated fair values are reasonable in the circumstances and comply with guidance set forth in [FAS 13 and other relevant accounting literature]. Changes in "margin normalization" and "ROE" adjustment methodologies and estimates were reasonable, in the circumstances, and do not constitute accounting irregularities, financial fraud,

or impermissible *earnings management.* Any errors found in connection with the application of sales-type lease accounting in respect of "margin normalization" or "ROE" adjustment estimates appear to be: (a) unintentional and/or due to misunderstanding of Xerox policies and procedures; (b) isolated (primarily in [Xerox Brazil and Xerox's Latin American organization]); and (c) immaterial in relation to Xerox' financial statements, taken as a whole.

(Emphasis in original.) The Skadden–PwC investigation also concluded that the establishment of the Rank Reserve conformed to GAAP, although the take-down did not.

The Skadden–PwC report regarding the lease accounting adjustments also assumed, however, that "KPMG extensively reviewed, analyzed, and tested the 'margin normalization' methodology, underlying data and assumptions and the effect thereof—both for Xerox Europe and for Xerox DMO (Brazil)" and "[d]uring the period 1998–2000, [the] 'ROE' adjustments were reviewed, analyzed and tested by KPMG." Daniel Dooley, the PwC partner who led the Skadden–PwC investigation, testified at his deposition that he did not actually see the KPMG work papers regarding the margin normalization testing in Europe, although he stated that other documents, including management letters issued by KPMG Europe, appeared to reflect "an extensive amount of work of an analytical nature" on margin normalization. Dooley agreed that the fact that KPMG knew of and analyzed the margin normalization adjustment was "one of the factors" his team relied on in concluding that the adjustment was appropriate.

Conway ultimately insisted that Xerox restate various aspects of its financial statements for 1998 and 1999. This First Restatement totaled $312 million. $100 mil-

lion of this was attributed to improper take-downs of the Rank Reserve in those years; $66 million to "imprudent and improper business practices in Mexico that resulted in certain accounting errors and irregularities"; and the remainder to "certain misapplications of GAAP under SFAS No. 13 ... primarily relat[ing] to the accounting for lease modifications and residual values as well as certain other items." Conway also insisted that various members of Xerox senior management, including Romeril, be removed from positions where they were responsible for the company's financial reporting.

On September 28, 2001, Xerox replaced KPMG with PwC as the company's independent auditor. PwC was prepared to accept the application of the ROE and margin normalization methodologies in Xerox's 2001 financial reporting, but ultimately chose to abandon those adjustments and to release the Second Restatement under pressure from the SEC. When Xerox released its Second Restatement, which accompanied its year-end financial statement for 2001, it stated that the ValueQuix system had recorded reasonable equipment prices at the inception of the leases. $2.4 billion of that $6 billion restatement was attributable to the reversal of the ROE and margin normalization adjustments. Approximately half the Second Restatement was attributed to a miscategorization of leases in South America as equipment rather than operating leases, an accounting treatment which the SEC has not raised in its summary judgment motion.

## II. Discussion

A court may not grant summary judgment unless the parties' submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and as such, "always bears the initial responsibility of ... identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *accord Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir.2002). In making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir.2002).

When the moving party has asserted facts showing that it is entitled to summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed. R.Civ.P.; *accord Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir.2002). While evidence as a whole must be assessed to determine whether there is a trial-worthy issue, *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999), conclusory statements are insufficient to defeat a motion for summary judgment. *Opals on Ice Lingerie v. Body Lines*, 320 F.3d 362, 370 n. 3 (2d Cir.2003). Throughout its consideration of a motion for summary judgment, a court "may rely only on admissible evidence." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir.2004). Thus, in determining whether

to grant summary judgment, this Court must (1) determine whether a genuine factual dispute exists based on the admissible evidence in the record; and (2) determine, based on the substantive law at issue, whether the fact in dispute is material.

## A. Liability Under Exchange Act Section 10(b) and Securities Act Section 17(a)

The SEC has presented claims against each of the KPMG Partners under Exchange Act Section 10(b) and Rule 10b–5 and Securities Act Section 17(a). For purposes of this Opinion, these statutes impose identical burdens of proof on the SEC.

■■■■ Section 10(b) creates civil liability for those who "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j. "Section 10(b) of the Exchange Act bars conduct involving manipulation or deception, manipulation being practices that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (citation omitted). To establish liability under Section 10(b), a plaintiff must prove that "in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996). Scienter "means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *Id.* (citation omitted).

Rule 10b–5, promulgated by the SEC under the authority of Section 10(b), imposes liability on those who "employ any device, scheme, or artifice to defraud"; "make any untrue statement of a material fact or [ ] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

Securities Act Section 17(a) makes it unlawful for any person "in the offer or sale of any securities" using the mails or an instrumentality of interstate commerce, "directly or indirectly,"

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). "With respect to [Section] 17(a)(1), essentially the same elements must be established in connection with the offer or sale of a security [as for Section 10(b) and Rule 10b–5 liability]." *First Jersey*, 101 F.3d at 1467. "Scienter, however, need not be established for the SEC to obtain an injunction . . . under [Sections] 17(a)(2) or (3)." *Id.*

1. The extent of the KPMG Partners' liability for misstatements attributed to KPMG

All defendants argue that they cannot incur liability as primary violators of Ex-

change Act Section 10(b) and Securities Act Section 17(a) because they did not make the misstatements at issue—namely, the statements in KPMG's audit opinion letters that Xerox's financials had been presented in accordance with GAAP in all material respects, and that KPMG's audits had been performed in accordance with GAAS. The audit letters were issued in the name of KPMG, as is required by GAAS, *see* AU § 508.08(i), and did not bear the signature of any individual auditor. The defendants assert that they can only be found liable, if at all, as aiders and abettors of a fraud committed by KPMG. The standard for aiding and abetting liability is described at length *infra*, and includes the requirement that the SEC prove that the defendant engaged knowingly, not just recklessly, in misconduct.

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that the Exchange Act did not authorize private claims for aiding and abetting Section 10(b) violations. The prohibition on private aiding and abetting causes of action no longer applies to the SEC, *see* 15 U.S.C. § 78t(e); *SEC v. U.S. Envtl., Inc.,* 155 F.3d 107, 113 (2d Cir.1998), but *Central Bank* and its progeny are relevant to the case at hand for their determinations of what distinguishes primary liability from aiding and abetting liability.

In *Central Bank,* at the request of a land developer who was one of the primary perpetrators of the fraud at issue in the case, Central Bank had postponed obtaining an independent review of a seemingly "optimistic" appraisal of land that had secured an issuance of bonds by a public building authority to finance public improvements. *Central Bank,* 511 U.S. at 167–68, 114 S.Ct. 1439. Before a review of the dubious appraisal was obtained, the public building authority defaulted on the bonds. No claim for primary liability was alleged against Central Bank.

The Supreme Court concluded that Section 10(b) did not proscribe "giving aid to a person who commits a manipulative or deceptive act." *Id.* at 177, 114 S.Ct. 1439. It found confirmation for its conclusion from the fact that Section 10(b) aiding and abetting liability would exist without proof of a critical element for a Section 10(b) recovery: reliance. *Id.* at 180, 114 S.Ct. 1439. Although it held that private aiding and abetting actions would not lie under Section 10(b), the Court noted that

> [t]he absence of [Section] 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met.

*Id.* at 191, 114 S.Ct. 1439 (emphasis in original).

The SEC's continuing right to bring aiding and abetting claims was codified by Congress's passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which included Exchange Act Section 20(e), 15 U.S.C. § 78t(e). Section 20(e) provides that "any person that *knowingly provides substantial assistance* to another person in violation of a provision of this title, or of any rule or regulation issued under this title, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." *Id.* (emphasis added).

■ Whether one is a primary violator or an aider and abettor "turns on the

nature of [one's] acts, not on [one's] state of mind when [one] performs them." *U.S. Envtl.*, 155 F.3d at 111. The line between primary liability and aiding and abetting is difficult to trace, however, and the case law within this Circuit is not unambiguous on the question of whether a defendant may be held liable for a material misstatement that was not publicly attributed to him. In *SEC v. First Jersey Securities*, 101 F.3d 1450 (2nd Cir.1996), in a formulation quoted by the SEC in its brief, the U.S. Court of Appeals for the Second Circuit stated that "[p]rimary liability may be imposed not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration." *Id.* at 1471 (citation omitted). It held that the chief executive and sole shareholder of a discount broker-dealer who had "hands-on involvement in the pertinent decisions" that facilitated a fraudulent scheme in which securities were sold at excessive markups could be held primarily liable under Section 10(b). *Id.* at 1472. The broker-dealer executed the fraud by not disclosing to its customers either the nature of the market for the securities or its own control of that market. *Id.* at 1471.

In *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir.1997), the Second Circuit held that allegations that an accounting firm failed to disclose the fact that one of the principals of a company for which it had created financial projections was a felon did not render it primarily liable under Section 10(b) because the firm had no duty to disclose such information about the principal. *Id.* at 721–22. The court quoted approvingly a case that held that

> [i]f Central Bank is to have any real meaning, a defendant *must actually make a false or misleading statement* in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is

not enough to trigger liability under Section 10(b).

*Id.* at 720 (emphasis added). The court continued: "Allegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms used throughout the complaint all fall within the prohibitive bar of *Central Bank.*" *Id.*

In *Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir.1998), the Second Circuit issued its clearest statement to date regarding the line between aiding and abetting and primary liability. The court held that an auditing firm could not be held liable for a misstatement contained in a company press release bearing "a notation that the information [was] unaudited and without mention of its outside auditor," *id.* at 171, even though the auditing firm had approved the financial statements that were disseminated in the press release, *id.* It required a plaintiff to show that the defendant actually made the false statement and, to conform with the reliance requirement, that the statement be attributed to the defendant. *Id.* at 175. It stated:

> [A] secondary actor cannot incur primary liability under the [Exchange] Act for a statement not attributed to that actor at the time of its dissemination. Such a holding would circumvent the reliance requirements of the Act, as reliance only on representations made by others cannot itself form the basis of liability. Thus, *the misrepresentation must be attributed to that specific actor* at the time of public dissemination, that is, in advance of the investment decision.

*Id.* (emphasis supplied) (citation omitted).

The court rejected the plaintiff's interpretation of *First Jersey* to mean that mere knowledge and substantial participation were sufficient to support primary liability, stating, "Here, we confront alleged fraud by accountants—secondary ac-

tors who may no longer be held primarily liable under [Section] 10(b) for mere knowledge and assistance in the fraud." *Id.* at 176. It noted that, in *First Jersey*, primary liability had been imposed on the CEO for directing his employees to make the false statements to customers. *Id.* at 176. Recognizing that other jurisdictions had adopted a "substantial participation" test for primary Section 10(b) liability, the *Wright* court explicitly declined to do so. *Id.* Rather, it characterized its own approach as a " 'bright line' test." *Id.* at 175. It specifically rejected the holding of *In re Software Toolworks,* 50 F.3d 615 (9th Cir. 1994), which held an accountant primarily liable based on its "significant role in drafting and editing" a letter from the issuer to the SEC. *Wright,* 152 F.3d at 175 (citing *Software Toolworks,* 50 F.3d at 628 n. 3). The court did state, however, that "[t]here is no requirement that the alleged violator directly communicate misrepresentations to investors for primary liability to attach." *Id.* at 175 (citation omitted).

The most recent occasion on which the Second Circuit has addressed the circumstances in which primary liability may be imposed is in *In re Scholastic Corp. Securities Litigation,* 252 F.3d 63 (2d Cir.2001). In *Scholastic,* the court ruled that primary Section 10(b) liability had been sufficiently

alleged against a book publisher's vice president for finance and investor relations. *Id.* at 76. The vice president argued that the company's misleading statements had not been attributed to him. *Id.* at 75. After discussing the vice president's involvement in the operations of the company and his responsibility for communicating with investors and analysts, the court concluded that the plaintiff's allegations supported the conclusion that the vice president "was primarily responsible for Scholastic's communications with investors and industry analysts. He was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by Scholastic." *Id.* at 76. In deciding what weight to give this discussion in *Scholastic,* it should be noted that the discussion occurred in the context of assessing whether the complaint's allegations of scienter were sufficient, *id.,* that it contained no reference to either *Central Bank* or *Wright,* and that the false statements on which the complaint relied included statements made in conference calls with analysts in which the vice president had participated. *Id.* at 70.[14]

Based on this survey of Second Circuit law, it appears that primary liability under

---

**14.** Two recent cases in this district have likewise addressed the question of when a statement not attributed to a defendant might support primary liability. The Honorable Gerald E. Lynch in *Global Crossing,* 322 F.Supp.2d 319, held that primary liability could exist even when statements were not publicly attributed to a defendant where it was appropriate to infer that investors reasonably attributed the statements to the defendant. *Id.* at 332–33 (citing *In re Lernout & Hauspie Sec. Litig.,* 230 F.Supp.2d 152, 166–67 (D.Mass. 2002)). Finding that this principle reconciled *Scholastic* and *Wright,* Judge Lynch held that the plaintiff adequately alleged primary liability against Arthur Andersen LLP ("Andersen") where the public knew that Andersen was the company's auditor, and it was alleged that

Andersen prepared, directed, controlled, helped create, or materially assisted in preparing the false financial disclosures made to the public. *Id.* at 334. Relying on this formulation, in *Teachers' Retirement System of Louisiana v. ACLN Ltd.,* No. 01 Civ. 11814(LAP), 2004 WL 2997957 (S.D.N.Y. Dec.27, 2004), the district court held that the American affiliate of the auditor that signed the audit opinions at issue in that case could be held primarily liable because there were sufficient allegations both that the public was aware that the American affiliate was in fact acting as the auditor and that it had made the statements contained in the audit reports. *Id.* at *7–*9. These cases represent the outer limit of primary liability for statements attributed to an entity other than the defendant.

Section 10(b) may attach in a discrete set of circumstances in which the defendant was not identified to the public as the speaker. The *First Jersey* and *Scholastic* decisions suggest that primary liability can attach to a corporate officer for a company's false statement where it can be shown that the officer was sufficiently responsible for making the false statement. In each case, the Court of Appeals was unconcerned with whether the statements were publicly attributed to the individual officer. The issue was not one of aiding and abetting, but rather whether the individual was sufficiently responsible for the entity's speech such that he could properly be said to have made the false statement.

 Under *Scholastic*, it appears plausible that the reliance element in a private action under Section 10(b) would be satisfied by the public's reliance on the entity's statement as opposed to a statement attributed specifically to the individual officer. It is unnecessary, however, to decide whether primary liability could be imposed on the KPMG Partners on this basis in a private securities action. The SEC, unlike a private plaintiff, is not required to prove reliance when it brings enforcement actions under the securities laws. *SEC v. Credit Bancorp, Ltd.*, 195 F.Supp.2d 475, 490–91 (S.D.N.Y.2002) ("The SEC does not need to prove investor reliance, loss causation, or damages in an action under Section 10(b) of the Exchange Act, Rule 10b–5, or Section 17(a) of the Securities Act." (citing, *inter alia, SEC v.*

*North Am. Research & Dev. Corp.*, 424 F.2d 63, 84 (2d Cir.1970))). Accordingly, in an SEC enforcement action, there appears to be no reason to impose a requirement that a misstatement have been publicly attributed to a defendant for liability to attach, at least so long as the SEC is able to show that the defendant was sufficiently responsible for the statement—in effect, caused the statement to be made—and knew or had reason to know that the statement would be disseminated to investors. This formulation covers a narrower scope of conduct, and therefore a smaller class of defendants, than would be implicated by the "substantial participation" test rejected by the Second Circuit in *Wright.*[15]

 Dolanski, Safran, and Conway functioned as the engagement partners on the Xerox audits: Dolanski in 1997, Safran in 1998 and 1999, and Conway in 2000. According the KPMG's January 1997 Audit Service Manual—U.S. ("1997 KPMG Manual"), an engagement partner is "responsible for the technical quality of the KPMG audit service," including "developing the audit strategy and communicating it to the other members of the KPMG audit service team," "directing the audit in accordance with KPMG policies and professional requirements," and *"forming the audit opinion."* (Emphasis added.) The manual emphasizes that the "ultimate decision" whether to issue an audit report lies with the engagement partner, but notes that if the engagement partner and an audit man-

---

**15.** This Court considered whether to hold individual accountants primarily liable for misstatements signed by an auditing firm in *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2003 WL 21488087 (S.D.N.Y. June 25, 2003). That Opinion quoted the statement in *Wright* that defendant may not be held liable under Section 10(b) for a statement not attributed to him at the time of its dissemination and recognized that the Second Circuit had rejected a "substantial participation" standard for pri-

mary liability. *Id.* at *8. The dismissal of the individual accountants from that action also rested, however, on the fact that the complaint contained no allegations of scienter—and, indeed, no specific factual allegations at all—that would support a finding that those defendants were liable. *Id.* Moreover, *WorldCom* was a private securities action in which the plaintiff was required to prove reliance. It is therefore distinguishable from the case at bar.

ager or concurring review partner disagree, other partners are ordinarily consulted. Unresolved disagreements must be memorialized in the work papers.

Given that the engagement partner has the ultimate authority to determine whether an audit opinion should be issued, it is clear that the KPMG Partners who served as engagement partners are properly considered responsible for the misstatements at issue in this case. Stated differently, Dolanski, Safran, and Conway should be deemed to have made the misstatements. Nothing in the record cited by the parties tends to undermine this conclusion regarding the role of these defendants in issuing KPMG's audit opinion letters. If the other requirements for liability under Section 10(b) and Section 17(a) are met, Dolanski, Safran, and Conway may thus be held liable as primary violators.

■ Whether Yoho, as a concurring review partner, can be said to have made KPMG's misstatements presents a closer question. Yoho and the SEC cite to two types of sources detailing the role of a concurring review partner: the internal KPMG manuals and standards issued by the American Institute of Certified Public Accountants ("AICPA"). Although Yoho argues that only the AICPA standards are relevant, both sources are considered here with respect to the question whether Yoho may be held liable as a primary violator. The proper inquiry in deciding whether Yoho was a source of KPMG's misstatements concerns Yoho's actual authority under the circumstances, not merely the scope of his duties under GAAS.

The KPMG 1997 Manual describes a concurring review partner as "an audit partner not otherwise involved in directing the engagement who has the appropriate expertise and experience to perform a concurring review." It notes:

> The objectives of the concurring review are *to give additional assurance that:*

> — the audit report and financial statements are clear, concise, and understandable to a person not familiar with the details of the engagement;

> — professional standards and, when applicable, *legal requirements as to disclosure,* format, and terminology *are complied with;*

> \* \* \* \* \* \*

> — *the financial statements appear to conform to applicable accounting and reporting standards* and relevant regulatory requirements, unless otherwise referred to in the audit report;

> — the financial statements make sense.

(Emphasis supplied.) Further,

> [i]f the concurring review partner requires explanation of some matters, he or she clarifies them with the engagement partner or by discussion with other members of the KPMG audit service team. *In the event of differences of opinion, the audit report is not released until matters raised between the engagement partner and concurring review partner are satisfactorily resolved.* Although *the engagement partner is responsible for the ultimate decision,* resolution of differences of opinion ordinarily would involve consultation with other qualified partners.

(Emphasis supplied.) The manual further states: "The concurring partner's review is not a substitute for the engagement partner's review. It does not relieve the engagement partner of responsibility for the adequacy of the examination or for the appropriateness of the audit opinion." KPMG's December 1999 Audit Service Manual outlines a similar role.

The AICPA SEC Practice Section Guidelines (SECPS § 1000.39), effective October 1, 1999, state that

The concurring [review partner]'s responsibility is to perform an objective review of significant auditing, accounting, and financial reporting matters and to conclude, based on all the relevant facts and circumstances of which the concurring [review partner] has knowledge, that *no matters that have come to his or her attention would cause the concurring [review partner] to believe that the client's financial statements covered by the firm's audit report are not in conformity with [GAAP] in all material respects or that the audit was not performed in accordance with [GAAS].*

The concurring [review partner]'s responsibility is not the equivalent of the audit engagement partner's responsibilities. Without first-hand knowledge of the client's business environment, the benefit of discussions with management and other client personnel, the opportunity to review client documents or controls, or the ability to observe the client's actions or attitudes, a concurring [review partner] generally is not in a position to make the informed judgments on significant issues expected of an audit engagement partner. However, the concurring [review partner] is expected to objectively perform the procedures specified below and reach conclusions based on all relevant facts and circumstances of which he or she has knowledge.

(Emphasis supplied.) The procedures for which a concurring review partner is responsible under the AICPA standard include "discussing significant accounting, auditing and financial reporting matters with the audit engagement partner"; "discussing the audit engagement team's identification and audit of high-risk transactions and account balances"; "reviewing documentation of the resolution of significant accounting, auditing and financial reporting matters"; and "reviewing a summary of unadjusted audit differences."

Although it appears under KPMG's internal guidelines that a concurring review partner's disagreement with an engagement partner's conclusions could prevent an audit opinion from being issued until the disagreement was resolved or, at least, formally memorialized, given the more limited scope of the concurring review partner's duties under either the KPMG or AICPA guidelines, he cannot be considered the source of an auditor's opinion that an issuer's financial statements conformed to GAAP and may not be said to have been the author of any misstatements in that regard. Yoho may thus only incur aiding and abetting liability for his involvement in the audits. Under Section 20(e), 15 U.S.C. § 78t(e), he may only be held liable if he "knowingly provide[d] substantial assistance to another person" in a securities fraud violation.

■ The SEC argues that Yoho may be held liable under subsections (a) and (c) of Rule 10b–5, which bar "employment of a manipulative device" and "committing a manipulative device or deceptive act." 17 C.F.R. § 240.10b–5(a) & (c). While it is true that a person need not make a misstatement to incur liability under Section 10(b) and Rule 10b–5, the facts here, involving the issuance of clean audit opinions despite significant distortions in the issuer's financial statements, present a classic misstatement case. The SEC does not posit how, in any concrete manner, the misstatements it alleges could be construed as a device or scheme. The cases it cites involve factually dissimilar violations. *See, e.g., SEC v. Zandford,* 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) (looting clients' brokerage accounts); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (acting as market makers for

securities sold at inflated prices); *Global Crossing*, 322 F.Supp.2d at 336 ("masterminding" a financial fraud, including structuring sham transactions). Because the core misconduct alleged is in fact a misstatement, it would be improper to impose primary liability on Yoho by designating the alleged fraud a "manipulative device" rather than a "misstatement."

### 2. Scienter

Three of the four KPMG Partners, Dolanski, Conway, and Yoho, have moved for summary judgment on the basis that the evidence does not support an inference of scienter. Their motions are denied.

### a. Dolanski and Conway

"The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5 ... is an intent to deceive, manipulate, or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) (citation omitted). In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court recited this scienter standard and left open the question "whether, in some circumstances, reckless behavior is sufficient for civil liability under Section 10(b) and Rule 10b–5." *Id.* at 193 n. 12, 96 S.Ct. 1375. It is clear that at the pleading stage, a plaintiff may "(1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness or (2) allege facts to show that the defendants had both motive and opportunity to commit fraud." *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir.2004) (citation omitted). The Second Circuit has long held that recklessness fulfills the standard of proof under Section 10(b) as well. *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 207 (2d Cir.2000); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575 (2d Cir.1982). Further, "[t]he Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences. Whether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact." *Press v. Chemical Investment Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999) (citation omitted).

For a defendant's conduct to constitute recklessness, it must be "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger [of fraud] was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000) (citation omitted). For an auditor, recklessness must "approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Id.* at 98 (citing *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir.1982)); *see WorldCom*, 352 F.Supp.2d at 495–96.

In reversing a judgment against an accountant under Section 10(b), the Third Circuit once observed that the "core requirement" in proving an auditor's scienter is proof that the defendant "lacked a genuine belief that the information disclosed was accurate and complete in all material respects." *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979). Relying on *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, C.J.), and *O'Connor v. Ludlam*, 92 F.2d 50 (2d Cir. 1937), the Third Circuit ruled:

> A showing of shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it have traditionally supported a finding of liability in the face of repeated assertions of good faith. In such cases, the factfinder may justifiably conclude that despite those assertions the danger of misleading was so obvious

that the actor must have been aware of it.

*Id.* (citation omitted).

After a bench trial, a court within this District explained that an auditor's recklessness "requires more than a misapplication of accounting principles." *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992). Rather, a Section 10(b) plaintiff

> must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*Id.* (citation omitted).

Recently, the Second Circuit found that a plaintiff had proven at trial that an auditor had acted with scienter when the auditor acted in a manner that easily could be "foreseen to result in harm." *AUSA Life,* 206 F.3d at 221. The auditor had certified financial statements that failed to disclose that the company was "teetering on the edge of demise." *Id.*

> Had the ... accountants contemplated for a moment the results to which their questionable accounting could lead, they could have imagined that saddling the investors with an undisclosed risk would harm the investors, should the risk be realized. Therefore, one can easily find that [the auditor] possessed the requisite intent to deceive, manipulate, or defraud.

*Id.* In *AUSA Life,* the auditor knew that the financial statements did not conform to GAAP and informed management of that fact, but acquiesced when management rebuffed its advice. *Id.* at 205, 229. The auditor appreciated that its certification carried great weight and would be "compelling to the investors," *id.* at 221, and the court held that these facts established its scienter.

1. Dolanski

 Dolanski makes a number of points in support of his argument that the evidence does not support the inference that he had the intent to manipulate, deceive, or defraud under Section 10(b) and Rule 10b–5. The SEC has presented sufficient evidence, however, for a jury to find that Dolanski lacked a genuine belief that the Xerox financial statements were accurate in all material respects. Aware of the earnings pressures on Xerox, he allowed the company to expand its use of the ROE methodology aggressively and to initiate margin normalization without any serious study to determine that these unusual, indeed unique, accounting treatments would result in financial statements that fairly represented Xerox's financial condition. These and other facts, given the inferences to which the SEC is entitled at this stage in the litigation, are sufficient to raise a question of fact as to whether Dolanski acted with scienter when he authorized KPMG to sign its certification of Xerox's 1997 financial statements.

Dolanski notes that the KPMG auditors in the various offices were instructed to conduct their audits in compliance with GAAP and GAAS and to inform him immediately of any issues related to potential fraud or if they identified any illegal acts, and that no one communicated to him at any time during the 1997 audit that the accounting methods at issue were fraudulent. That the SEC has not proffered evidence that anyone specifically warned Dolanski that Xerox's accounting practices amounted to fraud does not establish that Dolanski was unaware of the danger of fraud. Indeed, the SEC has produced evidence that KPMG auditors directly communicated their doubts to Dolanski about the legitimacy of several Xerox accounting

methods—such as the memorandum from KPMG Rochester recommending that the ROE adjustment be discontinued. .

Dolanski points to the facts that Xerox had used the ROE methodology for a number of years prior to 1997 and that the ROE methodology had been tested by KPMG and its affiliates. There is a serious question of fact as to whether these "tests" provided any reasonable assurance that the Xerox accounting treatments, which were unorthodox, comported with GAAP. The December 31, 1995 "benchmarking survey" cited by Dolanski merely compares the ROE rates of other companies' captive financing units. It computes the effect on Xerox's earnings of lowering Xerox's ROE rate from 18% to 15%, but does not appear to engage in any analysis of whether the ROE adjustment produced appropriate lease accounting results. The 1997 tests performed by KPMG Rochester examine the financing rates but similarly do not seem to examine whether the ROE adjustment produced tenable results in other respects under FAS 13. Moreover, as noted above, memoranda issued by KPMG Rochester and KPMG Canada in 1996 and 1997 explicitly stated that the ROE adjustment should be discontinued. Dolanski similarly argues that KPMG UK tested the margin normalization methodology and told him that it was reasonable. The SEC has submitted communications from KPMG UK casting explicit doubt on the acceptability of the methodology, however.

Dolanski emphasizes that the PwC partners retained in the investigations initiated by the Xerox Audit Committee and Xerox management, as well as defendants' expert Jerry Sullivan, have concluded that the ROE and margin normalization adjustments produce results consistent with GAAP. He also notes that, in 2001, the PwC audit team had decided to accept the ROE and margin normalization methodolo-

gies until Xerox restated its prior financial statements without these methodologies pursuant to its settlement with the SEC.

While these instances of seeming ratification of Xerox's accounting methods are significant evidence regarding the legitimacy of Dolanski's professional judgment, they do not suffice to take the scienter issue out of the province of the jury. The SEC points to evidence that tends to show that the investigating PwC partners received assurances from Conway and others at KPMG that the ROE and margin normalization methodologies had been appropriately tested by KPMG; as noted above, however, there is a substantial question as to whether the fundamental soundness of these techniques was tested in such a manner that KPMG could have been reasonably confident that they yielded results consistent with FAS 13.

Regarding reserves, Dolanski points out that the PwC partners Dooley and Kelly disagreed about whether the establishment of the Rank Reserve complied with GAAP. Once again, the ratification of that accounting method by another auditor is not sufficient to take the issue away from the jury. The SEC has presented sufficient evidence for a jury to find that the contingency for which the reserve was created was too remote to justify any auditor's acceptance of the reserve in good faith. As noted in the report of Regan, one of the SEC's accounting experts, "[t]he creation of an acquisition liability, which is later improperly utilized to reduce operating expenses and increase earnings" is a known accounting gimmick.

Dolanski also notes that the effect of maintaining improper cushion reserves is to delay the recognition of revenue, whereas the ROE and margin normalization adjustments advanced the recognition of revenue, and that "[s]uch facially inconsistent allegations fail to support the SEC's claim

that Mr. Dolanski acted with scienter." Dolanski has not moved on the issue of materiality and, therefore, the parties have not addressed in detail the comparative and overall effect of the various accounting maneuvers on the 1997 Xerox financial statements. Dolanski asserts, however, that the offsetting effect on the reporting of Xerox's 1997 revenues was only $800,000,[16] in the form of an amortization charge. Thus, it would appear that the improper creation of the reserve in 1997 did not undermine Xerox's overall effort to advance revenue. The creation of specious reserves is principally designed to assist in the improper bolstering of reported revenues in future reporting cycles, and the SEC has shown that Dolanski's endorsement of the creation and manipulation of cushion reserves in 1997 may serve as evidence of his scienter.

Dolanski also contends that the evidence shows that he had no reason to believe that the adjustments to residual values were for an improper purpose. It is undisputed that Xerox was introducing a number of new digital products in 1997. Xerox's internal corporate finance manual outlined the policy in detail, stated that it viewed the prohibition on revision of upward residual values to apply to fiscal years subsequent to the year a transaction occurred, and noted that retroactive adjustments to residual values "may be particularly appropriate for new products introduced early in the year whereby marketplace economics are not fully known until some experience is obtained." KPMG concluded in 1997 that Xerox's residual values did not technically comply with GAAP but were "extremely conservative." Dolanski argues that he thus "had no reason to suspect that Xerox intended to use these upward adjustments

for an improper purpose, such as manipulating its profits." He also notes that the upward adjustments to residual values totaled $36 million in 1997, an amount he contends is immaterial. The SEC points to evidence that KPMG Rochester communicated to Dolanski at the end of 1996 that the adjustments to residual values violated FAS 13.

In sum, while Dolanski presents arguments and evidence to support a finding that he acted in good faith with respect to each of the identified accounting irregularities, on a motion for summary judgment, the SEC is entitled to have the inferences drawn in its favor. The SEC has presented sufficient evidence to support a jury finding that Dolanski was well aware of the danger that Xerox's 1997 financial statements materially misstated its financial condition, yet authorized KPMG to issue a clean audit opinion.

### b. Conway

 Conway was the engagement partner when KPMG certified Xerox's 2000 financial statements. Brought in to replace Safran, after Xerox lobbied successfully for Safran's removal, Conway was confronted just months later with an SEC investigation of Xerox and, eventually, KPMG. While Conway required Xerox to issue its First Restatement, and to remove six executives from financial reporting duties, he nonetheless authorized KPMG to issue a clean audit opinion based on the Xerox financial statements that continued to rely on the disputed ROE and margin normalization practices.

Taking all inferences in the SEC's favor, the SEC has shown that there are material questions of fact as to whether Conway acted with scienter. The SEC has pre-

---

**16.** According to Dolanski, this amounts to less than one-tenth of 1% of Xerox's pre-tax in-

come.

sented evidence from which a jury could find that Conway realized that the abandonment of the ROE and margin normalization adjustments would have a profound effect on Xerox's presentation of its financial condition, and that these adjustments were extraordinary and unsupported by any reliable testing. The SEC argues that in requiring Xerox to correct other accounting irregularities and to make management reforms Conway consciously provided cover to both KPMG and Xerox so that neither had to confront and renounce the core accounting strategies that had been used in prior years as well as in 2000 to advance revenue improperly.

Conway argues just as persuasively that he acted in good faith and would have had no motive to commit fraud. He points out that he had worked as an accountant for thirty-five years and was scheduled to retire three years after he was involved with the Xerox account, "obviating any long-term incentive to commit fraud." Conway also notes that the SEC was investigating Xerox during this period, and that Xerox was conducting independent investigations at KPMG's behest. He argues: "To suggest that two separate law firms ..., two separate accounting teams from a competing accounting firm, and [KPMG's own outside legal counsel] Mr. Young would all help Conway assist Xerox in committing a fraud while the SEC was scrutinizing these precise issues is simply irrational." Conway cites two district court cases that hold that pleading facts that indicate that a showing that an auditor merely wished to retain a client does not suffice to show motive. *See Zucker v. Sasaki*, 963 F.Supp. 301, 308 (S.D.N.Y.1997); *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1242 (S.D.N.Y. 1992).

■ The SEC is not required to prove scienter at trial through evidence of motive. Of course, the SEC contends that Conway had a significant incentive to pro-

tect KPMG and his fellow partners during a period of intense scrutiny by the SEC by endorsing longstanding accounting practices that had survived years of KPMG review. At the trial stage, however, the issue is one of knowledge rather than motive. Reliance on motive "inappropriately makes the scienter issue one of 'what did the defendant *want* to happen' as opposed to 'what could the defendant reasonably foresee as a potential result of his action.'" *AUSA Life*, 206 F.3d at 221 (emphasis in original). Thus, while evidence of Conway's motive to commit fraud will be relevant and admissible at trial, the SEC may be able to sustain its burden even in the absence of proof that Conway had a motive to commit fraud. A jury may well agree with Conway, but these disputed issues of fact, and inferences which can be drawn from them, must be resolved at trial.

### c. Yoho

1. The legal standard for aiding and abetting liability under Exchange Act Section 20(e)

■ Yoho faces potential liability only as an aider and abettor. Once again, Exchange Act Section 20(e) imposes liability in an SEC enforcement action on "any person that knowingly provides substantial assistance to another person in violation of a provision of this title, or of any rule or regulation issued under this title." 15 U.S.C. § 78t(e). The SEC argues that Section 20(e) encompasses recklessness in addition to actual knowledge. This contention must be rejected.

Elsewhere in the Exchange Act, in a provision also passed as part of the PSLRA, "knowingly" is explicitly defined as actual knowledge, but that definition is limited to its subsection. *See* 15 U.S.C. § 78u–4(f)(1)(A). Nevertheless, the fact that the "knowingly" was defined as actual knowledge in the very same bill that con-

tained Section 20(e) weighs in favor of the defendants' contention that the provision does not encompass recklessness. "[I]dentical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (citation omitted). In addition, the Senate considered and rejected an amendment to the proposed Section 20(e) that would have added recklessness to the standard. The record of the Senate debate clearly indicates that the legislators understood the import of the bill's language. Senator Bryan, the sponsor of the amendment (the "Bryan Amendment") recognized: "Although [the existing bill] authorizes the SEC to take action against aiders and abettors who knowingly violate the securities laws, it effectively eliminates the ability of the [SEC] to proceed against reckless professional assisters." 141 Cong. Rec. S9032, S9083 (daily ed. June 26, 1995). Senator Dodd opined:

> [W]hen it comes to the issue of fraud, knowing intentional fraud, we do not change anything in effect [by amending the bill].... People who are knowingly involved in those activities, all can be subject to the maximum financial penalties. What we are talking about here is a much lower standard and one that would apply, as the amendment indicates, to knowing or reckless behavior.

*Id.* at S9084. The Bryan Amendment was voted down, and the floor debate over language of the amendment bolsters defendants' contention that Congress intended to allow the SEC to bring aiding and abetting actions only against violators with actual knowledge.

In support of its contention that Section 20(e) encompasses recklessness, the SEC notes that courts reference pre-*Central Bank* case law on aiding and abetting to flesh out the requirements of the provision, citing *SEC v. Lybrand*, 200 F.Supp.2d 384, 399 (S.D.N.Y.2002). The

contention that Section 20(e) was intended to codify existing law is a tenuous one, however. The law prior to *Central Bank*, and thus prior to the PSLRA, was not uniform on the issue of what constituted the requisite scienter for aiding and abetting liability, and the Supreme Court had in fact granted certiorari on the issue in *Central Bank*, although it never reached it because of its outright rejection of private aiding and abetting claims under Section 10(b) in that case. *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 844 (2d Cir.1998) (citing 61 U.S.L.W. 3813–14, 508 U.S. 959, 113 S.Ct. 2927, 124 L.Ed.2d 678 (U.S. June 8, 1993)). Congress was aware of this lack of uniformity when it passed Section 20(e). *See* 141 Cong. Rec. at S9084 (statement of Sen. Dodd) ("Let me point out that prior to the Central Bank of Denver [case] the courts across the country adopted different types of scienter standards, for the aiding-and-abetting context.").

In any event, the Second Circuit has long espoused a restrictive standard for aiding and abetting liability under the securities acts. In 1990, it held in a private aiding and abetting action that "[i]f there is no fiduciary duty ... the *scienter* requirement increases, so that [a plaintiff] need[s] to show that [the defendant] acted with *actual intent.*" *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir.1990) (emphasis added). Assuming that pre-Section 20(e) case law applied, the *Lybrand* court summarized the current state of the law in this Circuit regarding the scienter standard as follows:

> [I]t is well-established that recklessness satisfies the scienter requirement for aider and abettor liability when the alleged aider and abettor owes a fiduciary duty to the defrauded party. Generally, where there is no fiduciary relationship, the scienter requirement scales upward—the assistance rendered must be

*knowing and substantial.* Courts in this district have also held that recklessness satisfies the scienter requirement where the plaintiffs were third parties whose reliance on the defendant's fraudulent conduct was foreseeable or where the defendant owed a duty of disclosure to the defrauded party.

*Lybrand,* 200 F.Supp.2d at 400 (citation omitted) (emphasis supplied).

Moreover, even if the statute permitted liability to be assessed on the basis of reckless behavior, the facts of this case do not bring it within any of the recognized exceptions to the general requirement of actual knowledge under Section 20(e). It is clear that Yoho had no fiduciary relationship to Xerox shareholders. Rather, the SEC contends that, because the KPMG Partners could foresee that investors would rely on KPMG's audit opinions, the facts of this case fall into a "foreseeable reliance" exception to the knowledge requirement that some district courts have applied. Two of the three cases cited by the SEC for this exception find the existence of a fiduciary relationship between the auditor and identified third parties, however. *See CMNY Capital, L.P. v. Deloitte & Touche,* 821 F.Supp. 152, 157–58 (S.D.N.Y.1993); *Ades v. Deloitte & Touche,* 799 F.Supp. 1493, 1502 (S.D.N.Y. 1992). The brief treatment of the issue in *In re Leslie Fay Cos. Sec. Litig.,* 835 F.Supp. 167 (S.D.N.Y.1993), is puzzling. That case cites a statement in which the auditor's letter withdrawing its opinion "request[ed] that [the issuer] take reasonable steps to notify any persons who are likely to be relying on our opinion that our opinion has been withdrawn and should not be relied upon" as a basis for imposition of a recklessness standard. *Id.* at 175–76. To the extent the decision appears to conclude that an auditor's awareness that the general public will rely on its audit opinion is sufficient to import the

recklessness standard into an aiding and abetting claim, it will not be followed here.

## 2. Sufficiency of the evidence to support a finding that Yoho had actual knowledge of fraud

■■■ Yoho contends that he fulfilled his obligations as a concurring review partner and thus cannot be held liable for aiding and abetting fraud. He notes that the Xerox audits were performed by experienced engagement partners at KPMG with "stellar reputations" within the firm. Yoho saw that the audits generated voluminous work papers, showing that the audit teams gave in-depth consideration to the various accounting treatments at issue. He claims that the record contains no evidence showing that material GAAP violations came to his attention. He characterizes accounting methods such as the ROE and margin normalization adjustments as issues about which reasonable accountants could disagree, citing *Price Waterhouse,* 797 F.Supp. at 1240, and *In re IKON Office Solutions, Inc. Secs. Litig.,* 277 F.3d 658, 673 (3d Cir.2002). He notes that the PwC investigators retained by the Xerox Audit Committee and Xerox management accepted certain accounting methodologies at issue in this case.

The SEC has pointed to sufficient evidence to warrant sending the issue of whether Yoho knew Xerox's financial statements were materially misstated to the jury. For instance, Yoho was aware of the absurd results that Xerox's accounting for price increases and lease extensions yielded in Brazil in 1999; Yoho's comment on the draft memorandum that discussed the charge could be interpreted as awareness that KPMG's application of a 5% materiality threshold to those charges that remained unreversed at the end of that year was improper. A jury could also find that Yoho was aware that Xerox continued

to use the ROE and margin normalization methodology despite clear indications that these adjustments produced untenable results. In regard to ROE, the Coolidge Memorandum noted that "[o]ne analysis [performed by KPMG Rochester] showed that Xerox's rates were historically below prime, but the spread below prime had increased as their credit worsened"—an economically irrational result that a jury could infer informed Yoho that Xerox's financials were significantly misstated.

As noted above with respect to Dolanski, other accountants' approval of the accounting methods employed by Xerox constitutes evidence weighing in favor of a finding that Yoho did not act in bad faith when he failed to object to them but is not sufficient to remove the issue from the jury's consideration. Moreover, Yoho's general awareness of the reputations of the engagement partners, as well as the time and effort that the KPMG teams devoted to the Xerox audits, is not enough to compel summary judgment when specific facts in the record could support a finding that Yoho knew significant accounting improprieties were afoot at Xerox. Yoho's motion for summary judgment on this basis is accordingly denied.

B. Liability Under Exchange Act Section 10A(b)

▮ Dolanski, Conway, and Yoho argue that they cannot be held liable under Exchange Act Section 10A(b) because the provision applies only to the accounting firm retained to do the audit, not to individuals who performed an audit under the aegis of the firm. Section 10A(b) was enacted in 1995 as part of the PSLRA. The relevant provisions were amended by the Sarbanes–Oxley Act of 2002, § 205(b), Pub.L. No. 107–204, 116 Stat. 745, 774. Section 10A(b) in its original and amended forms dictates the steps an auditor must take when it detects an illegal act, includ-

ing reporting the illegality to management and if necessary to the board of directors.

The current statute provides, in relevant part:

(b) Required response to audit discoveries

(1) Investigation and report to management

*If, in the course of conducting an audit* pursuant to this chapter to which subsection (a) of this section applies, *the registered public accounting firm detects* or otherwise becomes aware of information indicating that *an illegal act (whether or not perceived to have a material effect on the financial statements of the issuer*) has or may have occurred, the firm shall, in accordance with generally accepted auditing standards, as may be modified or supplemented from time to time by the Commission—

(A)(i) determine whether it is likely that an illegal act has occurred; and

(ii) if so, determine and consider the possible effect of the illegal act on the financial statements of the issuer, including any contingent monetary effects, such as fines, penalties, and damages; and

(B) as soon as practicable, inform the appropriate level of the management of the issuer and assure that the audit committee of the issuer, or the board of directors of the issuer in the absence of such a committee, is adequately informed with respect to illegal acts that have been detected or have otherwise come to the attention of such firm in the course of the audit, unless the illegal act is clearly inconsequential.

(2) Response to failure to take remedial action

If, after determining that the audit committee of the board of directors of the

issuer, or the board of directors of the issuer in the absence of an audit committee, is adequately informed with respect to illegal acts that have been detected or have otherwise come to the attention of the firm in the course of the audit of such firm, the registered public accounting firm concludes that—

(A) the illegal act has a material effect on the financial statements of the issuer;

(B) the senior management has not taken, and the board of directors has not caused senior management to take, timely and appropriate remedial actions with respect to the illegal act; and

(C) the failure to take remedial action is reasonably expected to warrant departure from a standard report of the auditor, when made, or warrant resignation from the audit engagement;

the registered public accounting firm shall, as soon as practicable, directly report its conclusions to the board of directors.

15 U.S.C. § 78j–1(b) (emphasis supplied).

Once the board of directors receives a report, it is required to inform the SEC within a single business day, and to give a copy of its notice to the SEC to the accounting firm. *Id.* § 78j–1(b)(3). If the accounting firm does not receive a copy of the notice within the required time, it may resign from the engagement. Whether or not it resigns, it must forward a copy of its report, or documentation of any oral report, to the SEC within a day of failing to receive a copy of the board's notice. *Id.* § 78j–1(b)(3)–(4).

In its current form, Section 10A(b) imposes its obligations on "the registered public accounting firm." Prior to the 2002 amendments, however, "the independent public accountant" was the term used in place of "the registered public accounting firm" throughout the quoted provision.

"Independent public accountant" was not defined in the unamended provision or elsewhere within the Exchange Act. The parties have pointed to no discussion in the legislative history indicating that the change in terminology was intended to be substantive.

In the amended provision, under a definition likewise added by the Sarbanes–Oxley Act, a "public accounting firm" means

(A) a proprietorship, partnership, incorporated association, corporation, limited liability company, limited liability partnership, or other *legal entity* that is engaged in the practice of public accounting or preparing or issuing audit reports; and

(B) to the extent so designated by the rules of the [Public Company Accounting Oversight] Board, *any associated person of any entity* described in subparagraph (A).

15 U.S.C.A. § 7201(11) (emphasis supplied). No rules regarding "associated persons" have been issued by the Public Company Accounting Oversight Board ("PCAOB"). The statutory definition makes clear, however, that although the PCAOB has the power to *exempt* certain persons "engaged in only ministerial tasks," the statutory default is broadly inclusive:

(A) In general

The terms "person associated with a public accounting firm" (or with a "registered public accounting firm") and "associated person of a public accounting firm" (or of a "registered public accounting firm") mean *any individual proprietor, partner, shareholder, principal, accountant, or other professional employee of a public accounting firm,* or any other independent contractor or entity that, in connection with the preparation or issuance of any audit report—

(i) shares in the profits of, or receives compensation in any other form from, that firm; or

(ii) participates as agent or otherwise on behalf of such accounting firm in any activity of that firm.

(B) Exemption authority

*The [PCAOB] may,* by rule, *exempt persons engaged only in ministerial tasks* from the definition in subparagraph (A), to the extent that the [PCAOB] determines that any such exemption is consistent with the purposes of this Act, the public interest, or the protection of investors.

15 U.S.C.A. § 7201(5) (emphasis supplied). Under the associated definition, as partners in KPMG, the defendants are clearly encompassed by the terms of the amended Section 10A(b).

Whether the defendants would be covered by the unamended Section 10A, which was the law during the years in which the alleged accounting fraud took place, is a closer question. If the scope of the unamended statute excludes the KPMG Partners, it would not be appropriate to sweep them up on the basis of the post-Sarbanes-Oxley language. It is an established principle that a statutory enactment is not to be given retroactive effect if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).[17]

As noted above, the term "independent public accountant" was undefined in the pre-Sarbanes-Oxley statute. Another subsection of Section 10A stated in its pre-

Sarbanes-Oxley form that "[e]ach audit required pursuant to this title of the financial statements of an issuer by an *independent public accountant* shall include" several specified audit procedures. 15 U.S.C. § 78j–1(a). The same terminology was used in several other Exchange Act provisions. For example, Exchange Act Section 13 specified that "[e]very issuer of a security registered [on a national securities exchange] ... shall file with the Commission ... (2) such annual reports ..., certified if required by the rules and regulations of the Commission by *independent public accountants,* and such quarterly reports (and such copies thereof), as the Commission may prescribe". 15 U.S.C. § 78m (1994) (emphasis added); *see also id.* § 78l(b)(J)-(K) (specifying that the application for registration of a security on a national securities exchange was to include balance sheets and profit and loss statements "certified if required by the rules and regulations of the Commission by an *independent public accountant"* (emphasis added)). The latter provision was likewise amended by the Sarbanes–Oxley Act to refer to a "registered public accounting firm."

Statutory interpretation "begin[s] with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,* 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004) (citation omitted). A statutory provision's use of the definite article "the," as opposed to the indefinite "a," "an," or "any," indicates that Congress intended the term modified to have a sin-

---

**17.** Were the amended Section 10A narrower in scope than the former version, excepting the KPMG Partners from the reach of the former statute might be appropriate: "The government should accord grace to private parties disadvantaged by an old rule when it adopts a new and more generous one." *Landgraf,* 511 U.S. at 276 n. 30, 114 S.Ct. 1483.

gular referent. Recently, in considering language in the federal habeas statute such as that referring to "the person who has custody over [the petitioner]," the Supreme Court opined that "[t]he consistent use of the definite article in reference to the custodian indicates that *there is generally only one* proper respondent to a given petitioner's habeas petition." *Rumsfeld v. Padilla,* 542 U.S. 426, 434, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004) (emphasis supplied). In evaluating the wording of a jury charge in *Renz v. Grey Advertising, Inc.,* 135 F.3d 217 (2d Cir.1997), the Second Circuit stated: "Placing the article 'the' in front of a word connotes the singularity of the word modified.... In contrast, the use of the indefinite article 'a' implies that the modified noun is but one of several of that kind." *Id.* at 222. The most obvious place to look for the identity of a referent is elsewhere in the statute in which the term appears. *See, e.g., National Foods, Inc. v. Rubin,* 936 F.2d 656, 660 (2d Cir. 1991) (concluding that, "[a]bsent some reason to conclude otherwise," "the court" specified in one portion of a statute was the one referred to several sentences earlier).

In light of the unamended Section 10A(b)'s consistent use of the definite article, *the* independent public accountant to which the unamended provision refers is properly considered to be the accountant who certified or who was retained to certify an issuer's financial statements, as required by other provisions of the Exchange Act. Although such an accountant could be a natural person, in the case of a company traded on a national securities exchange, it is much more likely to be an accounting firm. In this case, the certify-ing accountant is KPMG, not an individual KPMG Partner serving as the engagement partner or concurring review partner on the audit.[18] That Congress intended a firm to be the referenced entity is confirmed by the provision's repeated use of the pronoun "it" to refer to "the independent public accountant": "the independent public accountant shall ... directly report *its* conclusions to the board of directors," 15 U.S.C.A. § 78j–1(b)(2)(C) (1997) (emphasis supplied); "the independent public accountant shall ... furnish to the Commission a copy of *its* report," *id.* § 78j–1(b)(3) (emphasis supplied).

None of the SEC's arguments to the contrary command a different conclusion. The SEC cites a single case, *SEC v. Solucorp Indus. Ltd.,* 197 F.Supp.2d 4, 12 (S.D.N.Y.2002), in which a Section 10A action was maintained against an individual accountant. It does not appear that the court was confronted with the question whether the provision properly applied to an individual accountant working for a firm, however.

The SEC also points to the portion of Section 10A governing cease-and-desist and other administrative proceedings allowing the SEC to "impose a civil penalty against the independent public accountant and any other person that the Commission finds was a cause of such violation." 15 U.S.C. § 78j–1(d). It cites this provision as evidence that Section 10A(b) may be enforced against individuals such as the KPMG Partners. The fact that the provision contains language specifically encompassing other persons may, however, just as easily be taken as an indication that "the independent public accountant" is not

---

**18.** This reading is consistent with GAAS requirements for the certification of an audit. Not only does GAAS allow an audit report certifying an issuer's financial statements to be issued under the name of a firm rather than that of the individual partner actually performing the work, the applicable GAAS standard actually requires that an audit report be signed in the name of the firm. *See* AU § 508.08 ("Reports on Audited Financial Statements").

as expansive a term as the SEC contends. "[L]egislative enactments should not be construed to render their provisions mere surplusage." *Dunn v. Commodity Futures Trading Comm'n,* 519 U.S. 465, 472, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997). Moreover, because specific language in Section 10A(d) covers both "the independent public accountant" and "any other person," the SEC's practice of bringing administrative enforcement proceedings against individual accountants cannot be given any weight in this analysis, even if *Chevron* deference were due.

Nor does the breadth of the term "public accounting firm," as used in the amended Section 10A(b) and defined to include associated persons, provide clear guidance regarding the meaning of the term "independent public accountant" in the former version of the provision. The SEC notes that the Sarbanes–Oxley Act specified that "[n]othing in this Act . . . shall be construed to impair or limit . . . the ability of the [SEC] to take, on the initiative of the [SEC], legal, administrative, or disciplinary action against any registered accounting firm or any associated person thereof." Sarbanes–Oxley Act of 2002, § 3(c)(3), Pub.L. No. 107–204, 116 State. 745, 750. While this statement indicates that Congress did not intend to restrict the SEC's previously granted authority, it does not exclude the possibility that Congress intended to *expand* the SEC's power to initiate legal action against individual accountants when it passed the Sarbanes–Oxley Act, which included the definition of "public accounting firm" that covers associated persons.

The SEC notes that the legislative history of Section 10A(b) contains numerous references to "accountants" and "auditors," without specific reference to ac-

counting firms. The parties cite to no portion of the legislative history which devotes any discussion to the issue of precisely who—the firm, or individual accountants associated with a firm—should face liability under the provision, however. There is no reason that Congress could not have chosen to impose obligations on "accountants" and "auditors" by placing the onus of compliance on the firms with which individual accountants are associated. Moreover, although it is packed with ambiguous language such as that referenced by the SEC, Senator Kerry's introduction to an earlier but virtually identical version of the bill that eventually became Section 10A [19] does specifically reference the firm as an entity:

> External auditors play a critical role in the self-regulatory process in the financial marketplace. When an external auditor certifies the financial statement of a business, *it* is simultaneously providing different services to different audiences.

> For the shareholders of the institution *it* is certifying, *it* is providing what is supposed to be a clear, full, and fair description of the actual performance of the business to assist the shareholder in determining the value of his investment, the performance of the company, and the strength of the company's management, as well as assurances that the company has no untoward risks from violations of law or regulatory compliance.

> To anyone else, an annual certification represents what may be the principal means by which an outsider can evaluate the safety of entering into a transaction with a business. . . .

\*　　\*　　\*　　\*　　\*　　\*

---

**19.** Section 10A was the result of a decade-long congressional effort. *See* Thomas L. Riesenberg, *Trying to Hear the Whistle Blow-*

*ing: The Widely Misunderstood "Illegal Act" Reporting Requirements of Exchange Act Section 10A,* 56 Bus. Law. 1417, 1428 (2001).

It is by no means easy for any outsider, including *accounting firms,* to detect the self-dealing, off-the-books accounting, the use of nominees and front companies, schemes to inflate income, manipulation of inventories, ... and similar practices of the crooks, criminals, and conmen who spring up anywhere they find an opportunity.

139 Cong. Rec. S3479–05, S3485–86 (daily ed. Mar. 23, 1993) (emphasis supplied).

There are contextual indicators that do support the SEC's interpretation of Section 10A. When the PSLRA was passed, an existing SEC regulation set forth the qualifications of independent public accountants under the Securities Act, the Exchange Act, and other statutes. That regulation, since amended, refers to an "independent public accountant" in terms that signify a natural person, but also specifically provides for the independence of a firm. *See* 17 C.F.R. § 210.2–01 (1995).

In addition, as enacted, Section 10A(b) paralleled certain then-existing GAAS standards contained in The Auditor's Responsibility to Detect and Report Errors and Irregularities, Statement on Auditing Standards ("SAS") No. 53 [20] (American Inst. of Certified Pub. Accountants 1988) and Illegal Acts by Clients, Statement on Auditing Standards No. 54 (American Inst. of Certified Pub. Accountants 1988), and added the requirement that the auditor report to the SEC in the event a company fails to act. Riesenberg, *supra* note 19, at 1425–28 (citing Financial Fraud Detection: Hearings on H.R. 574 Before the Subcomm. on Telecommunications and Finance of the Comm. on Energy and Commerce, 103rd Cong., at 46, 50 (1993) (written statement of Richard C. Breeden, SEC Chairman)). Those GAAS provisions address the duties of an independent audi-

tor to plan an audit to obtain reasonable assurance that financial statements are free from fraud, and an auditor's duty to withdraw from the engagement in appropriate circumstances. SAS 53 and SAS 54 in particular and GAAS generally prescribe rules of conduct for the *individual* independent auditor and her assistants, and the AICPA requires its members to comply with those standards when conducting an audit. AU § 161.01 (The Relationship of Generally Accepted Auditing Standards to Quality Control Standards, Statement on Auditing Standards No. 25 (American Inst. of Certified Pub. Accountants 1979)). SAS 25 also dictates that a "firm of independent auditors also needs to comply" with GAAS and should establish policies and procedures to assure that its audit engagements comply with GAAS. AU § 161.02. While the GAAS standards paralleled by Section 10A(b) clearly impose obligations on individual accountants as well as accounting firms, because the language of Section 10A(b) necessitates a different conclusion, their scope will not be treated as controlling here.

While the SEC regulation and SAS 53 and SAS 54 are significant evidence that the term "independent public accountant" was a term of art that was understood at the time Section 10A was enacted to refer in the first instance to the individual auditor, this understanding is insufficient to overcome the implications of Congress's decision to impose Section 10A's obligations on a single actor. When an accounting firm signs an audit or is engaged to perform the audit, Section 10A's obligations most appropriately fall on the firm. The SEC does not suggest that Section 10A liability should be imposed on individuals rather than firms; it argues instead

---

**20.** SAS 53 was amended in 1997 and is currently embodied in Consideration of Fraud in a Financial Statement Audit, Statement on

Auditing Standards No. 82 (American Inst. of Certified Pub. Accountants 1997).

that it should be imposed on both, a proposition not supported by the statutory text. Summary judgment is accordingly granted for the defendants who moved on the issue of whether the SEC may bring a claim against individual accountants under Section 10A(b).[21]

C. Dolanski's Motion for Judgment as a Matter of Law on All Claims Based on Price Increases and Extensions to Existing Leases

█ Dolanski has moved for judgment as a matter of law on all claims against him to the extent they relate to price increases and lease extensions in 1997. In the Complaint, the SEC introduces a table of allegedly fraudulent accounting devices, broken down by year and gross and net impact on Xerox's pre-tax earnings, with the sentence: "The hyphens in the table indicate accounting devices that are not the subject of this Complaint." For the year 1997, and hence the period in which Dolanski served as the engagement partner for KPMG's audit of Xerox, a hyphen appears in the row devoted to "Price Increases/Extensions." Dolanski contends he was thus not on notice of SEC's claims against him to the extent they are premised on facts regarding those specific accounting treatments. In response, the SEC notes that the Complaint alleges elsewhere that fraudulent accounting for price increases and lease extensions began in 1997, and that this allegation was sufficient to give Dolanski notice.

Rule 8, Fed.R.Civ.P., provides that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he 'short and plain statement' must provide the defendant with 'fair notice of what the plain-

tiff's claim is and *the grounds upon which it rests.'*" *Dura Pharms. Inc. v. Broudo,* — U.S. ——, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (emphasis added). Having expressly disclaimed price increases and lease extensions in 1997 as a basis for relief, the SEC must move to amend the Complaint before it may premise any claims on those facts. Dolanski's motion for judgment in his favor on all claims against him based on price increases and lease extensions is accordingly granted.

## III. Conway's Motion to Strike

Conway moves to strike the SEC's response (the "Counterstatement") to his Statement of Material Facts Pursuant to Local Rule 56.1 on the ground that the Counterstatement fails to comply with Rule 56(e), Fed.R.Civ.P., and Local Civil Rule 56.1 ("Rule 56.1"). Conway claims that the Counterstatement contains improper argument; fails to cite to evidence; contains conclusory allegations, unsubstantiated speculation, and citations to inadmissible evidence. He also moves to strike the statement of facts ("Statement of Facts") contained in the SEC's memorandum of law in opposition to the KPMG Partners' summary judgment motions on the basis that it does not comply with Local Rule 56.1, because it is not submitted separately in the numbered-paragraph format required by that rule.

Rule 56.1 provides that a party moving for summary judgment must "annex[ ] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Rule 56.1(a). Further,

---

**21.** Because this determination rests on defendants' contentions regarding the scope of the statutory language, the defendants' factual assertions, and Dolanski's contention that the

Section 10A(b) claim against him is barred on statute of limitations grounds, need not be reached.

[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended there is a genuine issue to be tried.

Rule 56.1(b). "Each statement by the movant or opponent ..., including each statement controverting any statement of material fact, must be followed by a citation to evidence which would be admissible...." Rule 56.1(d).

The SEC's Counterstatement, while overly argumentative in portions, cites throughout to record evidence and generally complies with Rule 56.1. Any paragraph not supported by record evidence has been disregarded by the Court. The evidence the admissibility of which is disputed by Conway was not relied on in the preparation of this Opinion in any event.

Local Rule 56.1(b) allows a party opposing a motion to submit its own statement of additional material facts not in dispute. This is different from the statement of facts on which a party relies in opposing summary judgment—many of which will be cited in the opponent's Rule 56.1 counterstatement, and some of which will simply be cited in the opponent's own narrative account of what the evidence shows. The SEC's Statement of Facts is accordingly not improper. Conway's motion to strike the SEC's Counterstatement and Statement of Facts is denied.

### Conclusion

The defendants' motions for summary judgment are granted in part. Summary judgment on the Exchange Act Section 10(b) and Securities Act Section 17(a) claims is denied for Dolanski, Safran, and Conway; summary judgment for Yoho is granted to the extent that he cannot be held liable as a primary violator under Sections 10(b) or 17(a). He may, however, be held liable for aiding and abetting a Section 10(b) violation under Exchange Act Section 20(e) to the extent that his conduct was knowing rather than reckless. Summary judgment is granted for all moving defendants on the Exchange Act Section 10A claims against them. Dolanski's motion for judgment on all claims against him arising from price increases and lease extensions is granted. Conway's motion to strike is denied.

SO ORDERED.

### ORDER

In response to errors in the December 28, 2005 Opinion, identified in the January 4, 2006 letter from counsel for defendant Dolanski, and the January 5, 2006 letter from counsel for defendant Conway, and to make other minor corrections, it is hereby

ORDERED that a revised summary judgment Opinion bearing today's date has been issued.

SO ORDERED.